Julian **BOND** and Andrew Young, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Ben W. **FORTSON**, Jr., Secretary of State of the State of Georgia, et al., Defendants.

Civ. A. No. 14992.

United States District Court,
N. D. Georgia,
Atlanta Division.

June 7, 1971.

Morris Brown, Atlanta, Ga., for plaintiffs.

Paul H. Anderson and Robert G. Young, Atlanta, Ga., for Eugene Gunby.

Arthur K. Bolton, Atty. Gen., Harold N. Hill, Jr., Robert J. Castellani, Asst. Attys. Gen., Atlanta, Ga., for Fortson, State Election Board of Georgia and Jimmy Carter.

Before BELL, Circuit Judge, and SMITH, and O'KELLEY, District Judges.

PER CURIAM.

This is a class action for declaratory and injunctive relief, in which plaintiffs attack that portion of the Georgia Election Code, Title 34 Georgia Code Annotated, providing that United States Senators and Representatives shall be elected by *majority* vote, setting up a run-off contest if no candidate receives a majority of the votes cast in the general election, and further providing a special election if the run-off fails to fill the office in question.[1]

There are three sub-classes of plaintiffs: candidates for Congressional offices, potential candidates, and voters. They set out four "causes of action":

(1) the majority vote requirement and concomitant provisions for run-offs and special elections provide in some cases for election of U. S. Congressmen on a date other than that prescribed by Congress (2 U.S.C.A. §§ 1 and 7), in violation of Art. I § 4 of the United States Constitution;

(2) the legislation attacked in some cases frustrates the result of valid general elections, and requires the legitimate (plurality) winner to again compete in a run-off or special election for the office he seeks;

(3) the attacked provisions add an impermissible qualification for office—election by a majority—to those established by Art. I § 2, cl. 2, and § 3, cl. 3 of the United States Constitution;

(4) adoption of the legislation was racially motivated, or alternatively the provisions have a racially exclusive effect and are invidiously discriminatory,

---

1. The applicable Code sections are: Ga.Code Ann. § 34–1511(b) (1), 34–1513(a) and 34–1514 (1970).

designed to perpetuate white-only political office retention in violation of the First, Ninth, Fourteenth and Fifteenth amendments to the United States Constitution.

Predicating jurisdiction on 28 U.S.C.A. § 1331, and 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 1981, plaintiffs requested that a three-judge panel be convened pursuant to 28 U.S.C.A. § 2284. The cause came on to be heard May 24, 1971, on plaintiffs' motion for summary judgment, the defendant Gunby's motion to dismiss, and the other defendants' motion to dismiss or for summary judgment.

Judge Gunby's motion to dismiss was granted in open Court. Plaintiffs' motion for summary judgment will be denied, and the remaining defendants' motion to dismiss or for summary judgment will be granted, on the grounds that the instant case does not present a "justiciable case or controversy," and a decision on the merits would be merely an advisory opinion forbidden by Art. III § 2 of the United States Constitution.

This case does not involve a statute unconstitutional on its face: there is no constitutional provision expressly providing for election of Congressmen by plurality vote or in terms prohibiting the states from requiring election by a majority vote. The broad grant of power given the state legislatures under Art. I § 4, cl. 1 [2] would indicate that either is permissible in the absence of specific Congressional action. While plaintiffs alleged that enactment of these election laws was racially motivated to perpetuate white-only public office retention in Georgia, they produced no evidence in support of this conclusion. Instead, they stood upon the inference claimed to be required by certain facts capable of proof, or of which the Court may take judicial notice, viz: (1) that Georgia has

a history of repressing minorities, (2) that Congress has found continuing voter discrimination in this region of the country, (3) that the laws attacked were enacted in 1964, and (4) that their effect is patently discriminatory against minorities.

But plaintiffs neglected other salient facts equally susceptible of judicial notice. Until this last decade, the Democratic party had a virtual monopoly in Georgia politics, and the main event of any political race for public office was the Democratic primary. *See* Table I.

### TABLE I

| YEAR | DEMOCRATIC PRIMARY | GENERAL ELECTION |
|------|--------------------|------------------|
| 1944 | 245,546 | 272,545 |
|      | 249,674 | 275,383 |
| 1948 | 703,048 | 362,504 |
|      | 692,485 | 365,360 |
| 1954 | 619,129 | 333,936 |
|      | 610,216 | 350,171 |
| 1956 | 620,492 | 541,094 |
|      | 600,656 | 507,608 |
| 1960 | 560,256 | 576,140 |
|      | 541,388 | 574,271 |

Consolidated vote in Senatorial (Upper figure) and Representative (Lower figure) races.

Victory in that primary was tantamount to election.

Under the old County Unit System, a *majority* of county unit votes was necessary for nomination to the office of United States Senator, as well as to a number of state offices. Ga.Laws 1917, pp. 193–184, amended Ga.Laws 1950, pp. 79, 80, *and* Ga.Laws 1962, pp. 1217, 1218, repealed Ga.Laws 1964, Extra.Sess. pp. 26, 197—(formerly Ga.Code Ann. § 34–3212). And for many years the Democratic officials of each Congressional District had power to determine whether a majority or plurality of popular or unit votes was necessary for nomination as a candidate for Representative. *See* Ga. Laws 1890–1, p. 210, repealed Ga.Laws 1964, Extra.Sess. pp. 26, 197 (formerly Ga.Code Ann. § 34–3201). Historically

2. which provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators."

such Congressional elections were on a *majority* basis. At least, no plurality contest is known or cited to the Court.

It was only when the County Unit System was abolished and a comprehensive new Election Code enacted that the requirement that Congressmen secure a majority of votes was carried over to the general election. These facts negate the inference of any discriminatory purpose proffered by the plaintiffs, insubstantially based as it is.

Unlike the plaintiffs in Phillips v. Rockefeller, 435 F.2d 976 (2d Cir. 1971), aff'g. 321 F.Supp. 516 (S.D.N.Y.1970), plaintiffs in this action have not yet experienced any adverse impact they claim these statutes threaten. They do not challenge the outcome of a particular election. We do not know what Congressional races they seek to enter or vote in, how many candidates will be in each race,[3] and whether those candidates will be white, black or members of some other minority. Indeed, it is unknown when, if ever, there will be a failure to elect on the first Tuesday in November, or whether a run-off will ever be required. Application of the attacked laws to the plaintiffs is speculative and remote, and may take place only under various circumstances each of which will have an undetermined impact on the controversy then presented. Plaintiffs have no immediate live controversy with the defendants requiring determination the constitutionality of the statutes they attack. Rather they seek an advisory opinion as to an abstract situation which *may* occur in the 1972 elections. This Court does not have judicial power to render such an opinion. Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); United States v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 5 L.Ed.2d 476 (1961); International Longshoreman's and Whsemen's Union, Local 37, v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954); United Public Workers v. Mitchell, 330 U.S. 75, 89–91, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941); United States v. Alaska S. S. Co., 253 U.S. 113, 40 S.Ct. 448, 64 L.Ed. 808 (1920).

"However, the rule against advisory opinions also recognizes that such suits often 'are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests.' United States v. Fruehof, [Fruehauf] 365 U.S. 146, 157 [81 S.Ct. 547, 554, 5 L.Ed.2d 476] (1961). Consequently, the Article III prohibition against advisory opinions reflects the complementary constitutional considerations expressed by the justiciability doctrine: Federal judicial power is limited to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process."

Flast v. Cohen, 392 U.S. 83, 96–97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968).

Only recently, in the context of the power of federal courts to enjoin criminal prosecutions and declare state criminal laws unconstitutional, were we reminded of the necessity that federal courts remain in their proper role, as circumscribed by the Constitution and Congress. *See* Younger v. Harris, 401 U.S. 37, 52–53, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971). To construe the state statutes attacked by these plaintiffs now would be a marked departure from that role.

Accordingly, the plaintiffs' motion for summary judgment is hereby denied, and the motion of the defendants Fortson, Carter and the State Election Board for summary judgment is granted.

It is so ordered.

---

3. In an election between only two candidates, *plurality* has the same mathematical meaning as *majority*.