992 F.2d 1548
 PUBLIC CITIZEN, INC.; McCracken Poston; Ralph Paige;
Betty Lee Sargent, Plaintiffs-Appellants,
v.
Zell MILLER, Governor of the State of Georgia; Max Cleland,
Secretary of State of the State of Georgia and
Director, Georgia State Board of
Elections; Paul Coverdell,
Defendants-Appellees.
 No. 93-8273.
 United States Court of Appeals, Eleventh Circuit.
 June 14, 1993.
 
 Kenneth S. Canfield, Doffermyre Shields Canfield & Knowles, Atlanta, GA, for plaintiffs-appellants.
 Mark Cohen, Asst. Atty. Gen., Michael P. Kenney, Alston & Bird, Atlanta, GA, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Georgia (No. 1:92-CV-2840-RHH).
 Before FAY and DUBINA, Circuit Judges, and HENDERSON, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 The judgment of the district court is AFFIRMED for the reasons set forth in the Order entered by that court on January 4, 1993, 813 F.Supp. 821
 
 
 2
 LO******
 
 
 3
 and attached hereto.
 
 ORDER
 
 4
 ROBERT H. HALL, District Judge.
 
 
 5
 This case is before the Court on Plaintiffs' Motion for a Preliminary and a Permanent Injunction and for Declaratory Judgment , Defendants' Motion to Dismiss , and Intervenor's Motion to Dismiss . This Court has jurisdiction pursuant to 28 U.S.C. § 1331. See also Roudebush v. Hartke, 405 U.S. 15, 17, 92 S.Ct. 804, 806, 31 L.Ed.2d 1 (1972) The Court DENIES IN PART Plaintiffs' Motion, GRANTS IN PART Defendants' Motion, GRANTS IN PART Intervenor's Motion, WITHHOLDS JUDGMENT IN PART, and ORDERS both parties to appear before the Court on January 19, 1993 at 3:00 p.m. to address whether the Court should consolidate Plaintiffs' count three into a case currently pending in the District.
 
 BACKGROUND
 
 6
 On November 3, 1992, the State of Georgia conducted a general election. Among the races on the ballot was one for the office of United States Senator. The incumbent, Wyche Fowler, received a plurality of the votes: 1,108,416 votes, or 49.22% of the total votes cast. His Republican opponent, Paul Coverdell, received 1,073,282 votes, or 47.66% of the total votes cast. Libertarian candidate Jim Hudson received 69,878 votes, or 3.1% of the total votes cast.
 
 
 7
 Because no candidate received a majority of the votes, Defendant Secretary of State Max Cleland ("Cleland" or the "Secretary"), acting pursuant to O.C.G.A. § 21-2-501 (1987)[1], set a run-off election between Mr. Fowler and Mr. Coverdell for November 24, 1992. Coverdell received a majority of the votes cast in the run-off election, with 635,114 votes, or 50.64%, while Fowler received 618,877 votes, or 49.35%.
 
 
 8
 On December 4, 1992, the Secretary presented the tabulated results of the November 24, 1992 run-off election to the Governor pursuant to O.C.G.A. § 21-2-502(b)(1).[2] On December 8, 1992, the Governor certified Mr. Coverdell's election to the President of the United States Senate pursuant to 2 U.S.C. § 1a. The President of the United States Senate must administer the oath of office to a newly elected Senator before that Senator-elect may take his seat in the Senate. 2 U.S.C. § 21. The President of the Senate may not administer the oath to a newly elected member, however, until he has received certification of that person's election from the governor of the state from which the new member was elected.
 
 
 9
 Plaintiffs are Public Citizen--a consumer organization with members in the state of Georgia--and four Georgia residents, each of whom voted for Fowler in both the general and run-off elections. Defendants are the Governor of Georgia, Zell Miller, and Georgia's Secretary of State, Max Cleland. Plaintiffs claim that the November 24, 1992 run-off election was a nullity because Article I, Section 4, Clause 1 of the United States Constitution and Sections 1 and 7 of Title 2 of the United States Code combine to restrict the State of Georgia from having held its most recent general election for the office of United States Senate on any day other than November 3, 1992 ("count one").
 
 
 10
 Plaintiffs also claim that O.C.G.A. § 21-1-501 and § 21-2-502(b)(1) violate the United States Constitution to the extent they require that United States Senators be elected by a majority of those voting in an election, because they add a qualification for the office that is not contained in the exclusive list of qualifications found in Article I, Section 3, Clause 3 of the United States Constitution ("count two").
 
 
 11
 Finally, Plaintiffs claim that the majority vote statute violates the Voting Rights Act, 28 U.S.C. § 1973, and the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution because the Georgia legislature enacted the statute in 1964 for the purpose of abridging the voting rights of black Georgia voters on account of their race or color, and the statute had this intended effect in the election at issue ("count three").
 
 
 12
 In their Amended Complaint, filed on December 16, 1992, Plaintiffs requested the following relief: (1) a declaratory judgment that the November 24, 1992 run-off election was and is null and void; that the November 3, 1992 election was the one and only valid election; and that Wyche Fowler, as the recipient of the plurality of votes cast in the general election, was the winner of Georgia's election for the office of United States Senator; (2) a declaratory judgment that O.C.G.A. § 21-2-501 and § 21-2-502(b)(1) are unconstitutional to the extent they seek to impose a majority vote requirement on candidates for the office of United States Senator; (3) a preliminary and permanent injunction directing Governor Miller and Secretary of State Cleland to rescind their certificate declaring Paul Coverdell as the winner of the 1992 Georgia election for the office of United States Senator; (4) a preliminary and permanent injunction directing Governor Miller and Secretary of State Cleland to certify Wyche Fowler as the winner of the 1992 Georgia election for the office of United States Senator, and to issue to him a commission of said office; (5) costs and attorneys fees; and (6) such further relief the Court deems to be proper. Amended Complaint, pp. 14-15 .
 
 
 13
 The Court held a hearing on December 3, 1992 on Plaintiffs' earlier Motion for a Temporary Restraining Order, at which time it denied Plaintiffs' Motion and granted a motion by Mr. Coverdell to intervene[3] . The Court also ordered the parties and Intervenor to expedite briefings on counts one and two--the only counts then--before the Court. Transcript of December 3, 1992 Hearing, p. 31. Plaintiffs subsequently amended their Complaint on December 16, 1992 to add count three. On December 21, 1992, Defendants filed a Motion to Dismiss for Failure to State a Claim . Finally, on December 30, 1992, Intervenor filed a Motion to Dismiss for Failure to State a Claim, and for Failure to Join an Indispensable Party .
 
 DISCUSSION
 
 14
 As a preliminary matter, the Court defines the scope of the task before it. Plaintiffs amended their Complaint to include count three after the Court had ordered expedited briefings on counts one and two. The Court has not extended its expedition order to count three, and will not address count three at this time. Instead, the Court ORDERS both parties to appear before it on January 19, 1993 at 3:00 p.m. to address whether the Court should consolidate Plaintiffs' count three into Brooks v. Harris, No. 90-1001 (N.D.Ga. filed May 8, 1990) (Freeman, J.)[4] --a case already pending before the Northern District of Georgia concerning the same claim.
 
 
 15
 Plaintiffs do not request the Court to compel action from anyone but the named defendants, nor has Mr. Fowler moved to intervene in this case. Thus, the Court will limit its Order to the narrow issues raised by Plaintiffs' motion for declaratory judgment and injunctive relief as it relates to counts one and two. This will require the Court to analyze the operative sections of Title 2 of the United States Code, and Article I, Sections 3 and 4 of the United States Constitution. Finally, the Court must interpret those sections of the Georgia Code at issue, and evaluate them for constitutional infirmity or federal preemption.
 
 
 16
 I. Jurisdiction.
 
 
 17
 This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331. The Court is also empowered to issue a declaratory judgment, should it find such relief warranted, pursuant to 28 U.S.C. § 2201. See also Corey v. Jones, 484 F.Supp. 616, 618 (S.D.Ga.1980) (finding that declaratory judgments are particularly well suited to resolving constitutional questions), aff'd in part, rev'd in part on other grounds, 650 F.2d 803, 807 (5th Cir. Unit B July 1981).
 
 
 18
 II. Standing.
 
 
 19
 Defendants (and Intervenor) assert that Plaintiff Public Citizen lacks standing to assert its own alleged rights or the alleged rights of its members because, as an organizational entity, it has no connection with the State of Georgia, and as a representative of its members, it seeks to represent third parties who would themselves lack standing. Defendants also assert that the individual named-plaintiffs lack standing because they have plead no more than a generalized grievance which they share with all other Georgia voters.
 
 
 20
 To have standing before a federal court, a plaintiff must assert a sufficiently concrete and individualized injury rather than a mere " 'generalized grievance[ ]' about the conduct of government." Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974). A claim is not a generalized grievance solely because the injury is shared in substantially equal measure by a large group of citizens. United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 686-688, 93 S.Ct. 2405, 2415-16, 37 L.Ed.2d 254 (1973). Rather, a generalized grievance is one in which the plaintiff alleges not a demonstrable and particularized injury resulting from a violation of a specific right, but injury to his general interest as a taxpayer or citizen in having the government follow the law. See Warth v. Seldin, 422 U.S. 490, 502-508, 95 S.Ct. 2197, 2207-2210, 45 L.Ed.2d 343 (1975).
 
 
 21
 A plaintiff must also suffer a real and immediate injury in fact to obtain standing before a federal court. City of Los Angeles v. Lyons, 461 U.S. 95, 101-102, 103 S.Ct. 1660, 1664-1665, 75 L.Ed.2d 675 (1983). An organization does not have standing in its own right merely because it is concerned about an issue. Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). It must sustain an injury as an entity to sue on its own behalf.[5]
 
 
 22
 An organization may also obtain standing on behalf of its members. In order to do so, the organization must meet three basic requirements: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Comm'n., 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).[6]
 
 
 23
 Finally, if the Court finds that one of the named plaintiffs has standing to pursue all of the asserted claims, it need not find that the other plaintiffs also have standing for those plaintiffs to remain in the suit. Watt v. Energy Action Educational Foundation, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); Carey v. Population Services International, 431 U.S. 678, 682, 97 S.Ct. 2010, 2014, 52 L.Ed.2d 675 (1977); Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 264 & n. 9, 97 S.Ct. 555, 562 & n. 9, 50 L.Ed.2d 450 (1977); Planned Parenthood Ass'n, 934 F.2d at 1465-66 n. 2.
 
 
 24
 In Schlesinger the Supreme Court found that the plaintiffs did not have standing because the allegedly violative government action "would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury." Id. 418 U.S. at 217, 94 S.Ct. at 2930. In contrast to the facts in Schlesinger, the Plaintiffs here claim that Georgia's majority vote statute deprives them of their right to vote by negating the effect of their votes in the November 3 general election. In the instant case, as in Schlesinger, the Plaintiffs claim violation of the United States Constitution. In contrast to Schlesinger and SCRAP, however, Plaintiffs here assert that they were deprived of an individualized right that the Constitution guarantees to them as individuals--the right to vote for and elect their own United States Senators. This is more than a generalized grievance about Georgia's conduct of government; this is an assertion that they are being denied the full scope of their individualized right to vote for their United States Senator. See Baker v. Carr, 369 U.S. 186, 206, 208, 82 S.Ct. 691, 704, 705, 7 L.Ed.2d 663 (1962) ("[V]oters who allege facts showing disadvantage to themselves have standing to sue.... [because t]hey are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes', not merely a claim of 'the right, possessed by every citizen, to require that the government be administered according to law....' ") (citations omitted).
 
 
 25
 The Court finds that each of the individually named plaintiffs in the instant case has standing to bring counts one and two of this suit, and that it, therefore, need not determine whether Public Citizen also has standing.
 
 
 26
 III. Failure to Join an Indispensable Party.
 
 
 27
 The Court finds that the parties have not sufficiently briefed the question of whether Mr. Fowler is an indispensable party as to counts one and two. The issue is mooted, however, by the Court's decision to grant Defendants' and Intervenor's motions to dismiss.
 
 
 28
 IV. Laches.
 
 
 29
 Defendants argue that Plaintiffs' claims should be barred by laches because they waited to challenge the majority vote statute until months after a non-majority outcome in the November 3 election appeared likely, and more than four weeks after Mr. Fowler was denied a victory despite his receipt of a plurality of the votes cast on November 3.
 
 
 30
 "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961) (citations omitted). See also AmBrit, Inc. v. Kraft Inc., 812 F.2d 1531, 1545 (11th Cir.1986). The Court finds that Plaintiffs' suit is not barred by laches. Plaintiffs' claims were not clearly ripe for adjudication prior to the November 24 run-off. This District has already held that a challenge to the majority vote statute prior to a candidate's actual receipt of a plurality but not a majority of the votes cast is not justiciable. Bond v. Fortson, 334 F.Supp. 1192, 1194 (N.D.Ga.) (three judge panel), aff'd 404 U.S. 930, 92 S.Ct. 272, 30 L.Ed.2d 244 (1971). As for the time period between the November 3 election and the November 24 run-off, the Court likely would have found Plaintiffs' claims were not ripe because a majority vote for Mr. Fowler on November 24 would have rendered them moot. See DeFunis v. Odegaard, 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974). Before November 24, Plaintiffs' candidate had not yet been defeated. Thus, not withstanding Defendants' arguments to the contrary, Plaintiffs did not demonstrate a sufficient lack of diligence in asserting their claims to warrant the application of laches.
 
 
 31
 V. Plaintiffs' Motion for Preliminary and Permanent Injunctions, and Declaratory Judgments, and Defendants' and Intervenor's Motions to Dismiss.
 
 
 32
 A party seeking a preliminary injunction must demonstrate that (1) there is a substantial likelihood of success on the merits, (2) he will suffer irreparable injury unless the injunction issues, (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) the injunction, if issued, would not be adverse to the public interest. Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir.1985); Shatel Corp. v. Mao Ta Lumber & Yacht Corp., 697 F.2d 1352, 1354 (11th Cir.1983).
 
 
 33
 The Court, in consideration of a Rule 12(b)(6) motion, may look only at the pleadings. See Fed.R.Civ.P. 12(b). The Rule allows dismissal of a complaint which fails "to state a claim upon which relief can be granted." Id. When faced with a motion to dismiss under Rule 12(b)(6), the Court construes the complaint broadly, accepting all facts pleaded therein as true and viewing all inferences in a light most favorable to the plaintiff. Cooper v. Pate, 378 U.S. 546, 546, 84 S.Ct. 1733, 1733, 12 L.Ed.2d 1030 (1964).
 
 
 34
 A. Count One: Times, Places and Manner.
 
 
 35
 Article I, Section 4, Clause 1 of the United States Constitution provides:
 
 
 36
 The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.
 
 
 37
 Both Congress and the States retain broad authority to regulate elections under the Times, Places and Manner Clause:
 
 
 38
 Unless Congress acts, Art. I, § 4, empowers the States to regulate the conduct of senatorial elections. [footnote omitted] This Court has recognized the breadth of those powers: 'It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.' Smiley v. Holm, 285 U.S. 355, 366 [52 S.Ct. 397, 399, 76 L.Ed. 795] (1932).
 
 
 39
 Roudebush v. Hartke, 405 U.S. 15, 24-25, 92 S.Ct. 804, 810, 31 L.Ed.2d 1 (1972). See also Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos is to accompany the democratic processes."); United States v. Classic, 313 U.S. 299, 311, 61 S.Ct. 1031, 1035, 85 L.Ed. 1368 (1941) ("[T]he states are given, and in fact exercise, a wide discretion in the formulation of a system for the choice by the people of representatives in Congress.").
 
 
 40
 Congress has regulated the timing of elections for United States Senators[7], and, according to its formula, elections in 1992 for United States Senators were to be held on November 3, 1992.
 
 
 41
 Plaintiffs assert that the run-off election on November 24 was and is a nullity because it was held on a day other than the allegedly exclusive day established by federal law for holding elections for the United States Senate (i.e., November 3, 1992). Accordingly, Plaintiffs argue, the person who obtained the most votes in the November 3 election (i.e., Mr. Fowler) is the legal victor.
 
 
 42
 Defendants offer a number of interrelated responses to Plaintiffs' arguments. First Defendants assert that federal law allows exceptions to the formula set forth in 2 U.S.C. §§ 1 and 7 in certain circumstances, and that Georgia's run-off election was such an exception. Second, Defendants assert that although November 3 is the legally prescribed day for elections, it is not the exclusive day for elections, and because Georgia held an election on November 3, it complied with the law's dictates. Third, Defendants Cleland and Miller argue that the majority vote statute describes any run-off as a "continuation" of the initial general election, and, thus, Georgia's November 24 run-off election cannot be construed as an election that failed to be held on November 3. Finally, Defendants argue that the majority vote statute is a regulation of the manner of holding elections, not the time of elections. According to these arguments, Georgia complied with federal law by holding a general election on November 3. Because the manner by which Georgia conducts elections is to require the winner to receive a majority of the vote, when none of the candidates accomplished this, the state-proscribed manner of electing Senators required that the general election be continued with a run-off on a later date.
 
 
 43
 Defendants cite 2 U.S.C. § 8 and Busbee v. Smith, 549 F.Supp. 494 (D.D.C.1982), aff'd, 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983) as support for their argument that the November 24 run-off was a legitimate exception to the dictates of 2 U.S.C. §§ 1 and 7. 2 U.S.C. § 8 provides:
 
 
 44
 The time for holding elections in any State ... for a Representative or Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States....[8]
 
 
 45
 Defendants claim that because the majority vote statute requires a majority vote to win, and because no candidate received a majority of the votes in the November 3 general election, Georgia experienced a "failure to elect at the time prescribed by law," entitling it to establish a different time for holding the election.
 
 
 46
 The meaning of the term "failure to elect" was explored by the District Court for the District of Columbia in Busbee. In 1982, the State of Georgia sought a declaratory judgment in federal court that its reapportionment plan complied with the requirements of the Voting Rights Act. 549 F.Supp. at 497. At the time, the State of Georgia was required, under section 5 of the Voting Rights Act, to obtain a ruling from the United States Attorney General, or a declaratory judgment from a federal court, approving any effort at reapportionment before it could implement its plan. Id. at 520. The Attorney General refused to approve the election schedule accompanying Georgia's reapportionment plan, and the District Court for the District of Columbia denied the state's request for a declaratory judgment on the issue. Id. at 518, 521. Instead, at the state's request, the court specified a schedule for the state's congressional elections that year, setting November 30, 1982 as the day for the general election in two congressional districts. Id. at 518-19, 522.
 
 
 47
 The state of Georgia subsequently challenged the court's power to set the general election for a day other than the first Tuesday after the first Monday in November. Georgia argued that 2 U.S.C. § 7 "absolutely require[d] that the general election be held on November 2." Id. at 522. The court rejected Georgia's objection and found that rescheduling the general election pursuant to section 5 of the Voting Rights Act did not violate 2 U.S.C. § 7. Id. at 523. The court noted that both Section 5 of the Voting Rights Act and 2 U.S.C. § 8 were enacted by the United States Congress, that Congress enacted section 5 more than one hundred years after it enacted section 7, and that the general rule of statutory construction held that "the subsequent enactment governs." Id. (citation omitted). The court also found that the effect of delaying the election pursuant to section 5 would not impede realization of section 7's underlying purposes. Id. at 524.
 
 
 48
 Although the decision in Busbee recognized that federal law contemplates occasional departures from section 7's dictates, id. at 524-25, the court's holding with regard to legislative reschedulings of elections stands for the proposition that section 5 of the Voting Rights Act allows such departures.
 
 
 49
 The court in Busbee acknowledged that 2 U.S.C. § 8 allows states, under certain circumstances, to hold elections at times other than those prescribed by section 7. Id. at 524-25. In addition to the circumstances it specifically enumerates--death, resignation, personal incapacity--section 8 allows states to reschedule elections "where exigent circumstances arising prior to or on the date established by section 7 preclude holding an election on that date." Id. at 525 (emphasis added). The court offered natural disasters, and the parties to the instant suit offer fraud and a tie vote as examples of 'exigent' circumstances warranting state rescheduling.
 
 
 50
 A carefully crafted law that, by its sole design, invents a 'failure to elect' cannot be thought to create an 'exigent' circumstance. This would unreasonably contort the word's definition, and allow any state to premeditate a complete avoidance of section 7's dictates merely by passing a law pursuant to which a general election must be held on a different day, thus resulting in a 'failure to elect' on the federally-mandated day. Congress, in passing section 8, could not have intended such emasculation of section 7 at a state's whim.
 
 
 51
 The majority vote statute, however, does not prescribe a bald departure from section 7's instructions. The statute respects section 7's formula for determining the date for general elections, and does not permit the state to circumvent holding an authentic general election on that date. Furthermore, the results of that election are fully binding upon the state. It is the interpretation of those results, however, that is influenced by the statute. The statute ensures that elections held on the federally-mandated days put into effect the will of the majority of voters. Accordingly, the statute deems an election resulting in a mere plurality not to be a completed election. To remedy such incompletion, the statute requires that the election continue into a run-off. Although the run-off takes place on a separate day, it does not negate section 7's effect. The run-off does not reschedule the earlier general election, nor does it negate that election's outcome. The results of the general election combine with the majority vote statute to cause a winnowing of the field of candidates which is then binding upon the run-off election.
 
 
 52
 A state's decision to interpret a plurality result as being inconclusive is not itself unconstitutional. Many states prescribe such an approach in primary elections (though states have always had greater autonomy in conducting primary elections). See, e.g., Ark.Code Ann. § 7-7-304 (1987); Fla.Stat. § 100.061 (1991); Ga.Code Ann. § 21-2-501; Miss.Code Ann. § 23-15-191 (1991); N.C.Gen.Stat. § 163-111 (1992); Okla.Stat. tit. 26, § 1-103 (1991); S.C.Code Ann. § 7-17-600 (1991); S.D.Codified Laws Ann. § 12-6-51.1 (1992); Tex.Elec.Code Ann. § 172.003 (1992). Section 7's timing regulation does not deprive states of the power to construe a mere plurality vote as an inconclusive vote. Because Georgia did just this, it legitimately 'failed to elect' a United States Senator on November 3, 1992. Then, pursuant to section 8, Georgia prescribed the time for holding its election for the United States Senate as 'continuing' through the run-off election on November 24, 1992.
 
 
 53
 Georgia's 'failure to elect' falls within the scope of such failures covered by section 8. A plurality outcome in the general election is similar to an election postponed due to natural disaster or voided due to fraud in that each is contemplated, yet beyond the state's ability to produce. It is this common element that makes their occurrence an 'exigent' circumstance. This is not changed by the fact that a plurality outcome results in a failure to elect only because the state so declares. A failure to elect due to a plurality outcome is no more a state construct than is a failure to elect due to state common law fraud.
 
 
 54
 Furthermore, despite Busbee's language to the contrary, the Court cannot limit section 8's application to those exigent circumstances that "preclude holding an election on [the date established by section 7]." Id. at 525. Otherwise, neither a tie vote nor fraud discovered after the election could warrant a new election.
 
 
 55
 In contrast to an emasculating statute, Georgia does not use section 8 to circumvent holding an election on November 3, or honoring its results. Although section 8, as discussed above, would probably not permit such a premeditated wholesale circumvention, it does permit states to prescribe different times for elections when they experience a legitimate failure to elect due to exigent circumstances after making an honest attempt to do so. This is what occurred here.
 
 
 56
 Georgia's majority vote statute, thus, does not effect an unconstitutional regulation of the timing for elections of United States Senators. The Court finds that Plaintiffs have failed to state a claim in count one, and, therefore, the Court grants Defendants' and Intervenor's Motions to Dismiss as to Plaintiffs' count one, and denies Plaintiffs' motion as to count one.
 
 
 57
 B. Count Two: Qualifications.
 
 
 58
 Article I, Section 3, Clause 3 of the United States Constitution (hereinafter the "Qualifications Clause") states:
 
 
 59
 No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen.
 
 
 60
 In Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the Supreme Court interpreted Article I, Section 2, Clause 2 of the Constitution, containing similar language regarding members of the House of Representatives, as setting forth the exclusive qualifications for membership in the House. Id. at 522, 89 S.Ct. at 1964. The qualifications can be enlarged upon or reduced only by amendment to the United States Constitution, not by congressional act. Id. at 522, 89 S.Ct. at 1964. Although Powell did not address states' power to add qualifications for membership in the House of Representatives, courts agree that states are similarly denied the power to act in this area. See Dillon v. Fiorina, 340 F.Supp. 729, 731 (D.N.M.1972); Stack v. Adams, 315 F.Supp. 1295, 1297 (N.D.Fla.1970); Exon v. Tiemann, 279 F.Supp. 609, 613 (D.Neb.1968); State ex rel. Chavez v. Evans, 79 N.M. 578, 581, 446 P.2d 445, 448 (1968). Furthermore, the Court's finding in Powell that the constitution sets forth the exclusive list of qualifications for membership in the House of Representatives logically must extend to the Constitution's list of qualifications for the United States Senate. See Dillon, 340 F.Supp. at 731; Benesch v. Miller, 446 P.2d 400, 402 (Alaska 1968).
 
 
 61
 Plaintiffs argue that the majority vote statute is an unconstitutional infringement on the Qualifications Clause's exclusivity because it adds as a qualification for the office of United States Senator that a candidate receive a majority of the votes cast. Plaintiffs assert that Georgia has, thus, "impermissibly limited the class of persons eligible to be elected." Plaintiffs' Reply, p. 15. Defendants respond that the Qualifications Clause sets forth requirements that relate to the 'personal qualifications' of a candidate, and that the majority vote statute, in contrast, regulates the 'manner' in which Georgia chooses among those 'qualified' candidates. In addition, Defendants argue that this District has already determined that the majority vote statute does not violate the Qualifications Clause.
 
 
 62
 In Bond v. Fortson, this District heard a challenge to the majority vote statute on the grounds that, inter alia, it violated the Qualifications Clause. 334 F.Supp. at 1192. Apparently, when the suit was filed, no general election for United States Senator or Representative in the State of Georgia had failed to produce a majority of votes for one candidate. In addition, none of the members of the plaintiff class had established in which races they intended to participate, and whether any of those races might result in a candidate receiving a plurality but not a majority of the votes. Id. at 1194. The Court found that the plaintiffs' case was not justiciable because "[p]laintiffs have no immediate live controversy with the defendants requiring determination the [sic] constitutionality of the statutes they attack. Rather they seek an advisory opinion as to an abstract situation which may occur in the 1972 elections." Id. (emphasis in original).
 
 
 63
 The case currently before the Court does not lack for justiciability, and the Court, thus, gains little guidance from the Bond court's holding. The Bond court, however, did state, in dicta, that it believed the majority vote statute does not violate the Constitution:
 
 
 64
 This case does not involve a statute unconstitutional on its face: there is no constitutional provision expressly providing for election of Congressmen by plurality vote or in terms prohibiting the states from requiring election by a majority vote. The broad grant of power given the state legislatures under Art. I § 4, cl. 1 [footnote omitted] would indicate that either is permissible in the absence of specific Congressional action.
 
 
 65
 Id. at 1193. This dicta, free from any detailed analysis in which the court would have engaged had it based its ruling on the statute's constitutionality, does not bind this Court.
 
 
 66
 The Supreme Court has never directly commented on how to distinguish additional 'qualifications' from mere regulations of elections. The First Circuit, however, has addressed this issue, and concluded that "the test to determine whether or not the 'restriction' amounts to a 'qualification' within the meaning of Article I, Section 3, is whether the candidate 'could be elected if his name were written in by a sufficient number of electors.' " Hopfmann v. Connolly, 746 F.2d 97, 103 (1st Cir.1984) (quoting State v. Crane, 65 Wyo. 189, 197 P.2d 864, 871 (1948)), vacated in other part on other grounds, 471 U.S. 459, 461, 105 S.Ct. 2106, 2107, 85 L.Ed.2d 469 (1985). See also Stack v. Adams, 315 F.Supp. at 1298 (recognizing the pivotal distinction between a complete bar to election and a mere "strong practical deterrent to election") (citing State ex rel. O'Sullivan v. Swanson, 127 Neb. 806, 257 N.W. 255 (1934)).
 
 
 67
 In Hopfmann, the plaintiff's name was excluded from the ballot in the Massachusetts Democratic Primary election for United States Senator because he failed to receive at least 15% of the vote on any ballot at the Democratic Party's convention. 746 F.2d at 99. The plaintiff sued, alleging, inter alia, that the 15% requirement unlawfully added a qualification for the office of United States Senator. Id. at 102. The court disagreed, finding that because the candidate could still be elected by write-in votes, the 15% rule did not fully preclude the plaintiff from obtaining the office, and, therefore, was not a 'qualification'. Id. at 103. Contrast this finding with cases in which courts found regulations which fully disqualified candidates from obtaining office to be unconstitutional. See, e.g., Dillon, 340 F.Supp. at 731 (holding unconstitutional a state law requiring candidates for the United States Senate to have resided in the state for at least two years); Stack, 315 F.Supp. at 1298 (holding unconstitutional a state law requiring candidates for the United States House of Representative not hold any other elective office after qualifying as a candidate for the House).
 
 
 68
 According to the First Circuit's analysis, the majority vote statute does not wholly disqualify a candidate from obtaining the office of United States Senator any more than would a requirement that a candidate receive a plurality of the votes cast to be elected. In Georgia, a candidate that wins a plurality but not a majority of the votes cast in the general election is by no means precluded from obtaining the office he sought. He is merely forced into a run-off against the person receiving the second-highest vote count. Thus, he continues to be a viable candidate for the office, free even from the 'strong practical deterrent' of having to collect his majority through write-in votes alone.
 
 
 69
 As for the run-off election, the requirement that a candidate receive a majority of the vote is merely a restatement of the truism that in a race between two people, the person who receives the most votes wins. It can not be argued seriously that this truism, standing alone, is an unconstitutional qualification for the office.
 
 
 70
 One may argue that the actual effect of the majority vote statute was to bar Mr. Fowler from obtaining the office of United States Senator because he failed to win a majority of the vote on November 3, and that the statute, therefore, acted as a 'qualification' for the office. This argument would be misguided, however, because Mr. Fowler's failure to gather a majority of the votes on November 3 did not incapacitate or disqualify him from obtaining the office, it merely required that he participate in the run-off election.
 
 
 71
 There are five things that could have disqualified Mr. Fowler from obtaining the office of United States Senator: (1) he could have been less than thirty years old, (2) he could have been a United States citizen for less than nine years, (3) he could have been an inhabitant of a state other than Georgia, (4) he could have finished third or below in the November 3 election, and (5) he could have received less than fifty percent of the vote in the November 24 run-off. The first three disqualifiers derive from the Constitution. The last two derive from the truism that a state may exclude a candidate who receives fewer votes than an opposing candidate from obtaining the office that he sought. Plaintiffs wisely do not challenge this final truism as an unconstitutional qualification.
 
 
 72
 The above analysis demonstrates why, even without using the First Circuit's approach, this Court must find that the majority vote statute does not unconstitutionally add to the Constitution's exclusive list of qualifications for the office of United States Senator. Defendants may overstate their case in arguing that the Qualifications Clause is an exclusive list only of candidates' 'personal' qualifications, see Newberry v. United States, 256 U.S. 232, 255-56, 41 S.Ct. 469, 473-474, 65 L.Ed. 913 (1921) (holding that an act of Congress establishing the maximum sum which a candidate for Congress might spend to procure his nomination was an unconstitutional addition to the Constitution's exclusive list of qualifications for the office); Benesch, 446 P.2d at 403 (holding that a state statute disqualifying as a candidate for the United States Senate anyone who failed to receive his party's nomination was an unconstitutional addition to the constitution's exclusive list of qualifications), and that state regulations of the manner of elections is wholly separate from regulations concerning a candidate's qualifications. Nonetheless, the majority vote statute is more accurately interpreted as a method for construing the meaning of the votes cast than as a way of describing the candidates involved in the campaign. If the Court were to find that this method for construing the meaning of votes cast in an election is an unconstitutional 'qualification' for the office, it would be hard pressed not to find a state law requiring that a candidate receive a plurality of the votes cast similarly infirmed. The Court finds that Plaintiffs have failed to state a claim in count two upon which relief may be granted and, therefore, grants Defendants' and Intervenor's Motions to Dismiss as to count two, and denies Plaintiffs' motion as to count two.[9]
 
 CONCLUSION
 
 73
 The Court GRANTS Defendants' and Intervenor's Motions to Dismiss counts one and two for failure to state a claim upon which relief can be granted. The Court, accordingly, DENIES Plaintiffs' Motions with regard to counts one and two. The Court WITHHOLDS JUDGMENT on Plaintiff's Motions with regard to count three, and WITHHOLDS JUDGMENT on Defendants' and Intervenor's Motions to Dismiss count three, and orders both parties to appear before it on January 19, 1993 at 3:00 p.m. to address whether the Court should consolidate count three into Brooks v. Harris, No. 90-1001 (N.D.Ga. filed May 8, 1990) (Freeman, J.).
 
 
 74
 So ORDERED.
 
 
 
 [1]
 O.C.G.A. § 21-2-501 (the "majority vote statute" or the "statute") provides, in part:
 (a) Except as otherwise provided in this Code section, no candidate shall be ... elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such ... public office.... In instances where no candidate receives a majority of the votes cast, a run-off ... election between the candidates receiving the two highest numbers of votes shall be held.... [S]uch run-off ... election shall be held on the twenty-first day after the day of holding the preceding ... election.... The candidate receiving the highest number of the votes cast in such run-off ... election ... shall be declared the winner.... The ... run-off election shall be a continuation of the ... election for the particular office concerned ... and only those votes cast for the persons designated as candidates in such ... run-off election shall be counted in the tabulation and canvass of the votes cast.
 
 
 [2]
 O.C.G.A. § 21-2-502(b)(1), in pertinent part, provides:
 "Upon completing the tabulation of any election for United States senator ... the Secretary of State shall lay the same before the Governor, who shall immediately issue commissions ... to the candidate[ ] receiving a majority of the votes for the office[ ]."
 Hereinafter, for purposes of discussing count two, the Court will use the term "majority vote statute" to refer to O.C.G.A. § 21-2-501 and § 21-2-502(b)(1) together to the extent they require that United States Senators be elected by a majority of those voting in an election.
 
 
 [3]
 Hereinafter, the Court will refer to arguments made by both Defendants and Intervenor as having been made by "Defendants."
 
 
 [4]
 Brooks is a consolidated case including United States v. Georgia, No. 90-1749 (N.D.Ga. filed August 9, 1990) (Freeman, J.)
 
 
 [5]
 Intervenor asserts that Plaintiff Public Citizen may not maintain this suit because it has not obtained a certificate of authority to transact business in Georgia as required by O.C.G.A. § 14-3-1502. This statute does not apply to federal courts in the state of Georgia when exercising federal question jurisdiction, and, therefore, does not prevent Public Citizen from bringing this action before this Court
 
 
 [6]
 Intervenor argues that the Eleventh Circuit has established two other requirements that a plaintiff must satisfy in order to have standing to assert a third party's interests. See Planned Parenthood Ass'n of the Atlanta Area, Inc. v. Miller, 934 F.2d 1462, 1465-66 n. 2 (11th Cir.1991). See also Singleton v. Wulff, 428 U.S. 106, 114-16, 96 S.Ct. 2868, 2874-2875, 49 L.Ed.2d 826 (1976). In Planned Parenthood, however, the Eleventh Circuit was evaluating the standing of an individual doctor to challenge a Georgia statute on behalf of his minor patients. Id. at 1465-66 n. 2. The Circuit Court did not discuss whether an organization seeking standing to challenge a statute on behalf of its members must also satisfy the two additional requirements. The United States Supreme Court has not applied the same standing requirements to organizations suing on behalf of their members as its has to an individual suing on behalf of another individual. The more stringent requirements applied in Singleton to individual physicians attempting to sue on behalf of their patients were not applied in Washington Apple Advertising Co. to an organization seeking standing on behalf of its members. Absent some indication from the United States Supreme Court or the Eleventh Circuit that these two additional requirements are also to be applied to organizations bringing suit on behalf of their members, the Court declines to find that Public Citizen must satisfy them in the instant case
 
 
 [7]
 2 U.S.C. § 1 prescribes the time for the election of United States Senators as follows:
 At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said state shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter. The time for election of United States Representatives is prescribed by 2 U.S.C. § 7 which provides:
 The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter.
 Taken together, 2 U.S.C. §§ 1 and 7 require that Senators be elected on the first Tuesday following the first Monday in the November preceding the expiration of the incumbent Senator's term.
 
 
 [8]
 The United States Congress enacted 2 U.S.C. § 8 in 1872, 41 years before the ratification of the Seventeenth Amendment which provides for the popular election of United States Senators. Because the election of Senators is governed by the same timing restriction as is the election of Representatives in 2 U.S.C. § 7, this Court is convinced that section 8 applies equally to Senators and Representatives
 
 
 [9]
 Plaintiffs assert that count two is dependent, at least in part, on certain factual allegations that cannot be resolved without a hearing. Plaintiffs' Reply, p. 29 . Plaintiffs base this assertion on the fact that in count two of their Amended Complaint they alleged that the majority vote statute "serves as a screening mechanism to prevent black candidates and candidates supported by blacks voting in a block from winning election as United States Senators." Amended Complaint, p 34
 Plaintiffs' count two alleges that O.C.G.A. § 21-2-501 and § 21-2-502(b)(1) violate the Qualification Clause to the extent they require that United States Senators be elected by a majority of those voting in an election. Neither discriminatory motive nor discriminatory effect is an element of an infraction of the exclusivity of the qualifications listed in the Qualifications Clause. Thus, the Court need not consider either in determining whether to grant Defendants' and Intervenor's Motions to Dismiss with respect to count two.