James Andrew **COLEMAN**

v.

**Zell MILLER, Governor of the State of Georgia and The State of Georgia.**

**Civ. No. 1:94–CV–1673–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 1995.

 

Randal Alonzo Mangham, Office of Randal Alonzo Mangham, Bruce S. Harvey, Office of Bruce S. Harvey, Melvin Robinson, Office of Melvin Robinson, Harold Michael Harvey, Office of Harold Michael Harvey, Atlanta, GA, for plaintiff.

James Andrew Coleman, Atlanta, GA, pro se.

Rene Octavio Lerer, Office of State Atty. Gen., Atlanta, GA, for Zell Miller and State of Georgia.

Dietrich W. Oellerich, Jr., Office of Dietrich W. Oellerich, Jr., Hephzibah, GA, James Michael Spence, Office of James Michael Spence, Augusta, GA, for Georgia Division, Sons of Confederate Veterans, Don Cheeks, Ben Harbin, Robin Williams, Eddie Brown Page, III, and Michael J. Padgett.

## ORDER

ORINDA D. EVANS, District Judge.

This civil rights action brought under 42 U.S.C. §§ 1983, 2000a, and 1971 is before the court on Plaintiff's motion for preliminary injunction. At issue is the constitutionality of the current state flag of Georgia, established by the Georgia General Assembly in 1956 pursuant to O.C.G.A. § 50–3–1. Plaintiff is an African–American citizen. He seeks an injunction ordering the immediate removal of the Georgia flag from all state office buildings. He claims that the legislation establishing the flag and the flag's design are discriminatory and racist in nature. The case is also before the court on Defendants' unopposed motion for partial judgment on the pleadings. In addition, the Georgia Division of the Sons of Confederate Veterans, Don Cheeks, Ben Harbin, Robin Williams, Eddie Brown Page, III, and Michael J. Padgett have moved to intervene. In this action Plaintiff seeks injunctive, declaratory, and monetary relief.

For the reasons discussed hereinafter, the motion to intervene will be denied.

Turning to the motion for preliminary injunction, evidentiary hearings were held on November 21 and December 15, 1994. The parties presented testimony by way of affidavits and live witnesses and exhibits were received in evidence. Having considered the

evidence and arguments and briefs of counsel, the court makes the following findings of fact and conclusions of law.

Until 1879, Georgia did not have an official flag. Prior to that, a number of flags were flown in Georgia including the Confederate national flag, also known as the "Stars and Bars." During the Civil War, the Confederacy adopted a square battle flag depicting a blue St. Andrew's Cross on a red field. The battle flag was carried by Confederate troops during the Civil War. One of the Confederate generals was General Nathan Bedford Forrest, founder of the Ku Klux Klan. The Confederate battle flag looked like this:

In 1879, Senator Herman Perry introduced a bill in the Georgia general assembly to adopt the first official state flag. 1878–79 Ga.Laws 114. The flag was a variation on the Stars and Bars. In 1902, the official design was modified slightly by adding the State coat of arms. 1902 Ga.Laws 81. The resulting flag was the official flag of the State of Georgia from 1902 until 1956. It looked like this: [1]

1. This example contains a variation on the State coat of arms which first appeared in the mid-1920's.

The court accepts the testimony of Defendants' expert witness, Edwin Jackson, that the publication of Margaret Mitchell's book *Gone With The Wind* in 1936 and its release as a movie in 1939 generated a wave of interest in southern history and culture throughout the United States, especially in the South. Also, the court accepts Mr. Jackson's testimony that this generated a revival of interest in Confederate ancestry and focused attention on the St. Andrews Cross, a prime symbol of the Confederacy. However, Mr. Jackson gave few concrete examples of manifestation of this interest until the mid–1950's, at which time expressions of interest in Confederate history coalesced with public outcry in reaction to desegregation mandates by the Supreme Court.

In 1952, the Georgia General Assembly passed a resolution providing that the Confederate memorial on Stone Mountain near Atlanta, Georgia should be completed. 1952 Ga.Laws 535. In 1954, the United States Supreme Court decided *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), holding that racial segregation in the public schools violated the Equal Protection Clause. In January 1955, the Georgia General Assembly passed a resolution urging completion of the Confederate memorial on Stone Mountain, finding that inadequate progress had been made since the 1952 resolution. 1955 Ga.Laws 5.

In April 1955, John Sammons Bell, counsel to the County Commissioners Association of Georgia and Chairman of the State Democratic Party, presented his idea of redesigning the flag to the annual conference of County Commissioners. The County Commissioners voted at that time to support efforts to redesign the flag. As is stated in Bell's affidavit, he had been a lifelong student of Confederate military history, and a collector of Confederate memorabilia. Long before the 1950's, Bell had thought of the idea of redesigning the flag to incorporate the Confederate battle flag.

In May 1955, the Supreme Court decided *Brown v. Board of Education,* 349 U.S. 294,

75 S.Ct. 753, 99 L.Ed. 1083 (1955) which required the desegregation of public schools proceed "with all deliberate speed." *Id.* at 300, 75 S.Ct. at 756.

In September 1955, the United States Postal Service issued a stamp commemorating Robert E. Lee. In November 1955, the Supreme Court decided *Holmes v. City of Atlanta*, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955), which required the desegregation of Atlanta's public golf courses and, by extension, all public facilities, including buses, parks, beaches, and swimming pools.

The second *Brown* decision, in particular, fomented great controversy and deep emotion. In Georgia, politicians, including Governor Marvin Griffin, advanced a policy of massive resistance to desegregation. Georgia voters adopted a constitutional amendment allowing parents to withdraw their children from public schools and diverting public money to nonsectarian, segregated private schools. In June 1955, Thurgood Marshall came to Atlanta to help organize citizens to attack segregation. Two months later, the Georgia School Board ordered all teachers belonging to the National Association for the Advancement of Colored People to resign from the organization or have their teaching licenses revoked. Days later, the State Attorney General distributed to public schools and universities a background paper advocating the doctrine of interposition, which essentially holds that states may interpose themselves to block the enforcement of unconstitutional federal mandates such as *Brown.* During this time, the Ku Klux Klan displayed the Confederate battle flag.

Shortly after the *Holmes* decision, Rosa Parks refused to give up her seat on a Montgomery, Alabama bus and Rev. Martin Luther King, Jr. instituted a bus boycott there which lasted for over a year. In Georgia the Board of Regents voted to permit the Georgia Tech football team to play an away game against a team with one black player; however, they also passed a resolution that no black players could participate in home games.

At the beginning of the 1956 legislative session, Governor Griffin addressed the State's Rights Counsel of Georgia, stating "the rest of the nation is looking to Georgia for the lead in segregation." In his 1956 state of the State address, Governor Griffin declared that

> there will be no mixing of the races in public schools, in college classrooms in Georgia as long as I am the governor. I campaigned with segregation as the number one plank in my platform. We must not desert future generations of Georgians. We must never surrender. All attempts to mix the races, whether they be in the classrooms, on the playgrounds, in public conveyances, or in any other close personal contact on terms of equality harrow the mores of the South.

The 1956 session of the Georgia General Assembly reflected its members' interests in segregation and southern history. Of the 150 acts passed in the 1956 session, ten bills and two resolutions dealt with massive resistance or segregation. One such law was the interposition resolution, which purported to declare the *Brown* cases and all similar decisions null and void. The resolution stated that in *Brown* the Supreme Court had usurped powers reserved to the states. It repudiated the Supreme Court's right to declare state laws unconstitutional. The resolution also asserted that Georgia had the right to decide for itself how to educate its children in keeping with the State's social structure, which was segregated. This resolution passed with twenty-five abstentions and only one dissent.

Within days after the interposition resolution's passage, in early February 1956, Senator Willis Hardin sponsored a bill to adopt John Sammons Bell's new design for the state flag. The bill passed in the Senate within three days. The only discussion on its adoption involved the Civil War centennial and the few surviving Confederate veterans remaining to participate. In the House, members debated the cost of changing the flag and whether Bell owned a copyright on his design and would profit from the change. The United Daughters of the Confederacy opposed changing the flag, arguing that the Confederate battle flag belonged to all Southerners and no single state had the right to appropriate it. The bill passed 107 to 32

with 61 abstentions.[2] The unusually high number of abstentions meant that the bill passed by only a fourteen-vote margin. Nothing in the record of the bill's debate reveals discussions of segregation or white supremacy. This is pointed out in a number of affidavits of former legislators. (*See, e.g.,* affidavits of S. Ernest Vandiver, Jr., Carl E. Sanders, Harold L. Murphy, Denmark Gro-

over, Jr., and Robert G. Stephens, Jr.). The General Assembly had no African–American members at this time. One former member, James Mackay, testified that the flag was adopted as a symbol of resistance to *Brown.*

The flag adopted in 1956, which today remains the official flag of Georgia, looks like this:

Many observers felt that by 1956 the Confederate battle flag had degenerated into a Dixiecratic symbol of white supremacy and defiant resistance to federal efforts at integration. (*See, e.g.,* affidavits of Dan Carter, Joseph H. Beasley, Joseph E. Lowery, and Teresa Nelson). To some, it represented the Ku Klux Klan. In fact, this flag is today still depicted on the Klan's stationery.

Plaintiff makes the following legal arguments: (1) the flag violates his equal protection rights because a discriminatory purpose motivated the General Assembly to adopt the flag, which has a discriminatory effect; (2)

the flag violates Plaintiff's First Amendment rights because it forces him to adopt a symbolic message which discriminates against African–American citizens; (3) the flag violates the Due Process Clause by depriving him of his fundamental privacy interest in associating with white people free from unwarranted governmental intrusion; (4) the flag's intimidating presence infringes on his right to the full and equal enjoyment of public facilities in violation of 42 U.S.C. § 2000(a); and (5) the flag intimidates African–Americans into refraining from exercising their right to vote.

---

**2.** The bill the legislature adopted is codified at O.C.G.A. § 50–3–1. It describes the new flag and then states:

Every force of the organized militia shall carry this flag when on parade or review.

■ Defendants make the following arguments in reply: (1) Plaintiff lacks standing to sue because his subjective assertions of injury are too speculative and the claimed connection between Plaintiff's injury and the flag is too remote; (2) the complaint fails to state a legal issue, raising instead a political question; (3) Plaintiff's § 1983 claims are barred by laches or Georgia's two-year statute of limitations for personal injury claims; and (4) Plaintiff has failed to demonstrate the prerequisites for issuance of a preliminary injunction, most importantly, that there is a substantial likelihood that he will prevail on the merits.

■ Defendants' procedural arguments are unpersuasive. Coleman alleged (1) an actual or imminent injury; (2) which is traceable to the alleged unlawful conduct; and (3) the relief requested is likely to remedy his injury. These allegations are sufficient to establish standing. *Jackson v. Okaloosa County, Fla.,* 21 F.3d 1531 (11th Cir.1994). Further, the political question doctrine does not render this case nonjusticiable. The standards for judicial determination of the issue are clear, the separation of powers doctrine is not relevant, and no secret or privileged information is involved. *See United States v. Martinez,* 904 F.2d 601, 602 (11th Cir.1990). Moreover, a state could, in theory, adopt a flag with a discriminatory message so explicit as to clearly violate the Constitution. Thus, this issue is justiciable.

■ The case is not barred by laches because Defendants presented no proof of lack of diligence on Plaintiff's part or prejudice to Defendants. *Public Citizen, Inc. v. Miller,* 813 F.Supp. 821, 827 (N.D.Ga.), *aff'd,* 992 F.2d 1548 (11th Cir.1993). Finally, the case is not time-barred because Plaintiff alleges continuing torts. *See Lufkin v. McCallum,* 956 F.2d 1104, 1106 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 246 (1992) (§ 1983 cases use state statute of limitations); O.C.G.A. § 9–3–33 (two-year statute of limitations in personal injury cases); *Adams v. Emory Clinic,* 179 Ga.App. 620, 622, 347 S.E.2d 670 (1986) (continuing torts).

To warrant preliminary injunctive relief, Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable harm unless the injunction issues; (3) that the threatened harm to Plaintiff outweighs whatever damage the proposed injunction will cause the opposing party; and (4) that the injunction, if issued, would not impair the public interest. *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.,* 909 F.2d 480, 483 (11th Cir.1990). A preliminary injunction is an "extraordinary and drastic remedy" not to be granted unless Plaintiff clearly satisfies the burden of persuasion on each of these four requirements. *Id.* At all times, the burden of persuasion lies with Plaintiff. *Id.*

The court first turns to the issue whether Plaintiff has shown a substantial likelihood of success on the merits.

■ Plaintiff first claims that the flag violates his equal protection rights because a discriminatory purpose motivated the General Assembly to adopt the flag, which has a discriminatory effect on African–Americans. The Fourteenth Amendment prohibits states from denying individuals equal protection under the law. *N.A.A.C.P. v. Hunt,* 891 F.2d 1555, 1562 (11th Cir.1990). Courts have long recognized that neutral applications of facially neutral laws may have a disparate impact. *E & T Realty v. Strickland,* 830 F.2d 1107, 1112 n. 5 (11th Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). In such cases, Plaintiffs must prove both purposeful discrimination and disparate effect. *Id.; Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

■ In determining the issue of purposeful discrimination, the issue is whether invidious discrimination was "a motivating factor" in the decision at issue. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Plaintiff need not prove that discriminatory motive was the only motive. *Id.* at 265, 97 S.Ct. at 563. Discriminatory motive may be found "even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials." *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1406 (11th Cir.

1993) (quoting *Williams v. City of Dothan, Ala.*, 745 F.2d 1406, 1414 (11th Cir.1984)). In evaluating issues of motive, evidence of surrounding circumstances is highly relevant. *Feeney*, 442 U.S. at 279 n. 24, 99 S.Ct. at 2296 n. 24. Historical background is relevant, as is legislative history. *Arlington Heights*, 429 U.S. at 267, 268, 97 S.Ct. at 564, 565.

The evidence in this case shows that the 1902 flag was the official flag of Georgia from 1902 until 1956. The evidence does not show that there was any dissatisfaction with the 1902 flag. When the flag was changed in 1956, there was strong public dispute over the issue of desegregation in Georgia. The 1956 session of the Georgia Legislature was dominated by bills and resolutions which largely represented the State's efforts to avoid desegregation. The designer of the 1956 flag had a genuine interest in memorializing the Confederacy, and the legislative debate concerning the bill did not, so far as the evidence reflects, include any statements that it was intended to discriminate against black citizens. The predominant part of the 1956 flag is the Confederate battle flag, which also is historically associated with the Ku Klux Klan. The legislators who voted for the 1956 bill knew that the new flag would be interpreted as a statement of defiance against federal desegregation mandates and an expression of anti-black feelings. Taking into account all of the foregoing evidence, the court finds that discriminatory purpose was a motivating factor in the legislature's passage of O.C.G.A. § 50-3-1 in 1956, though it was not the only factor.

The court now turns to evaluation of the evidence as to the second element of Plaintiff's equal protection claim—discriminatory effect. Even though the court accepts Plaintiff's assertion that the 1956 flag has a negative, devaluing effect on him, the evidence fails to show a sufficiently concrete, present-day discriminatory impact on African–Americans to sustain Plaintiff's burden of proof on this element. *See, e.g., Feeney*, 442 U.S. at 268–69, 99 S.Ct. at 2290–91; *Damiano v. Florida Parole and Probation Comm'n*, 785 F.2d 929, 932–33 (11th Cir.1986) (requiring a measurable effect on a protected class to

support an equal protection claim). Relevant to analysis of this prong is the almost forty-year lapse of time between passage of the legislation and today, together with the fact that the 1956 flag is not a symbol of discrimination which is express or clear on its face. Many citizens of Georgia, through factors of age or recent migration, have no particular awareness of how the 1956 flag came into existence. Some have no interest in this issue. The meaning of the symbol depends upon one's perspective. To some, it represents the undeniable fact that Georgia was a member of the Confederacy and did secede from the Union. The flag may also represent southern heritage, the old South, or values of independence. Undeniably, to others it represents white supremacy, rebellion, segregation, and discrimination. The court is not prepared to say that any of these perspectives are incorrect. The only thing that is clear is what the flag is not: a symbol of unity for Georgians.

■■■■ Plaintiff next argues that the flag compels him to be the courier of an ideological message he finds morally objectionable. The First Amendment prohibits governments from abridging the rights to free speech and free assembly. *Hunt*, 891 F.2d at 1565 (cites omitted). A state violates freedom of speech by forcing individuals to become couriers of ideological messages they find morally objectionable. *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). For example, the First Amendment prohibited New Hampshire from requiring a Jehovah's Witness to display the State's motto, "Live Free or Die," on his license plate. *Id.* In another case, the Supreme Court held that a state statute requiring students to participate in daily public ceremonies honoring the flag with words and traditional salute gestures infringed personal liberties. *Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Plaintiff's argument fails on two grounds. First, as discussed above, Georgia's flag on its face does not promulgate a sufficiently clear message of discrimination. Second, the record contains no evidence that Defendants forced Plaintiff to acknowledge the flag in any way. Each of the cases recognizing this

cause of action share an element of coercion, with the state forcing individuals to express acceptance of a symbol. Such coercion is absent here.

Plaintiff also claims that the flag chills his speech by overshadowing it with the State's own discriminatory message, chills his free association with Caucasians, and harms his ability to conduct his affairs without fear of discrimination. Again, the court finds that the flag's message is too ambiguous to support these arguments. Rather, Plaintiff's own emotions make his speech and association difficult. *Hunt*, 891 F.2d at 1565. The federal judiciary is not empowered to make decisions to assuage even the best-intentioned social sensitivity. *Id.* It must rely on the law as it is.

■ Plaintiff argues that the flag violates the Due Process Clause by depriving him of his fundamental privacy interest in associating with white people free from unwarranted government intrusion. The Constitution prohibits states from making unjustified intrusions on an individual's choices to enter into and maintain certain intimate human relationships. *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984). The freedom to form and preserve "certain kinds of highly personal relationships" is central to our constitutional scheme because these personal bonds cultivate shared ideals, foster diversity, and reflect the realization that individuals draw their emotional enrichment from close ties with others. *Id.* at 618, 104 S.Ct. at 3249. The personal affiliations warranting such constitutional shelter "are those that attend the creation and sustenance of a family"—marriage, childbirth, raising and educating children, and cohabitation with one's relatives. *Id.* at 619, 104 S.Ct. at 3250. They are distinguished by such factors as "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.*

The record simply does not support a claim that Defendants, through the flag, intruded on Plaintiff's personal affiliations. Moreover, Plaintiff's right to associate with white people in general is not the type of

intimate relationship garnering constitutional protection under this theory.

■ Plaintiff appears to argue that the flag violates his liberty interests by subjecting him to possible criminal prosecution under the Smith Act on charges of criminal syndicalism as a member of an organization which advocates the overthrow of the federal government. In light of the court's finding on the flag's symbolic ambiguity, the argument that the flag presently advocates the overthrow of the federal government cannot succeed. Moreover, the statute Plaintiff refers to requires a specific intent by the accused to overthrow the government by force or violence. 18 U.S.C. § 2385; *Scales v. United States*, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). Residing in Georgia while it flies the current flag does not constitute evidence of the requisite intent.

■ Plaintiff argues that the flag's intimidating and coercive presence infringes on his right to the full and equal enjoyment of public facilities in violation of 42 U.S.C. § 2000a. This statute, Title II of the Civil Rights Act of 1964, prohibits discrimination at places of public accommodation affecting commerce. It states:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

42 U.S.C. § 2000a. Its purpose was to remove the daily affront and humiliation arising from the denial of access to ostensibly public facilities. *Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969). Title II also prohibits intimidating, threatening, coercing, or attempting to intimidate, threaten, or coerce any person with the purpose of interfering with the rights secured by § 2000a. 42 U.S.C. § 2000a–2. The purpose of this section was to prevent states from criminalizing the rights that § 2000a conferred. The burden of proving a Title II

violation lies with Plaintiff. *Dean v. Ashling*, 409 F.2d 754, 756 (5th Cir.1969).[3]

Plaintiff concedes that he was not actively denied access to any public facilities, but claims the flag's presence intimidated him into foregoing the use of certain unspecified public accommodations. Plaintiff presents no legal support for this theory and the court has found none. Further, his vague factual allegations preclude a finding of substantial likelihood of success on the merits. Because Plaintiff has not met his burden, the claim cannot survive.

■ Finally, Plaintiff argues that the flag intimidates African–Americans into refraining from exercising their right to vote. The Voting Rights Act states in pertinent part that

> [n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote....

42 U.S.C. § 1971(b). Its purpose was to rid the country of racial discrimination in voting. *United States v. Ward*, 349 F.2d 795, 802–03 (5th Cir.), *modified on other grounds*, 352 F.2d 329 (1965).

Plaintiff presented no evidence that the flag affects his or other African–American citizens' voting habits. Nor has Plaintiff demonstrated that his allegations fall within the purview of this statute. Absent any legal or factual support, the court cannot find a substantial likelihood of success on the merits on Plaintiff's Voting Rights Act claim.

Because Plaintiff failed to show a substantial likelihood of success on the merits on any of his claims, the court need not address the other requirements for a preliminary injunction. Injunctive relief is inappropriate.

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**4.** The motion appears to indicate that some or all of the individual intervenors are members of the Georgia General Assembly.

Defendants move for partial judgment on the pleadings, arguing that the Eleventh Amendment bars Plaintiff's claims for damages against the State of Georgia and Defendant Miller in his official capacity. They also argue that the doctrine of qualified immunity bars Plaintiff's damages claim against Defendant Miller in his individual capacity. They maintain that, because Plaintiff does not allege that Defendant Miller was involved in the adoption of the flag or that his specific conduct violated clearly established law, Defendant Miller is entitled to qualified immunity. In this District, failure to respond to a motion indicates that the opposing party has no opposition to the motion. Local Rule 220–1(b)(1). Because Plaintiff has not responded, Defendant's motion is granted.

■ Turning to the motion to intervene, Georgia Division of the Sons of Confederate Veterans, Don Cheeks, Ben Harbin, Robin Williams, Eddie Brown Page, III, and Michael J. Padgett [4] ("Applicants") argue that a disposition in this matter may impair their unspecified interests, which are not adequately represented. They claim that an adverse decision could affect the budget and taxing power of the General Assembly. They also request leave to answer the amended complaint. Both Plaintiff and Defendants oppose this motion.

■ Applicants seeking to intervene as of right under Fed.R.Civ.P. 24(a) must establish four criteria: (1) the intervention application is timely; (2) an interest exists relating to the property or transaction which is the subject of the action; (3) as a practical matter, disposition of the action may impede or impair the ability to protect their interest; and (4) the existing parties to the lawsuit inadequately represent their interests. *Federal Savings & Loan v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 215 (11th Cir. 1993).[5] The Applicants bear the burden of proving each of these requirements. *Chiles*

**5.** Fed.R.Civ.P. 24(a) states in pertinent part that intervention must be permitted

> when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, un-

*v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir.1989). The interest the Rule refers to must be a "particularized interest rather than a general grievance." *Id.* at 1212. The court must presume that the Applicants' interest is adequately represented when an existing party pursues the same ultimate objective as the Applicants, unless they present some, even minimal, evidence to the contrary. *Falls Chase,* 983 F.2d at 215–16.

Applicants have not met their burden. First, their application is untimely. The court has already heard evidence and considered the parties' briefs on the motion for preliminary injunction. Second, Applicants fail to demonstrate that they have a particularized interest in the subject matter of this action. Third, they offer no explanation as to how this litigation, as a practical matter, could impair that unspecified interest. Although Applicants broadly claim that this action's disposition could affect the state budget or the General Assembly's taxing power, they provide no explanation of how this could occur. Fourth, they advance no evidence or argument showing that their interests diverge from Defendants'. Under these circumstances, intervention is inappropriate. Because intervention would unduly delay the adjudication of the original parties' rights, the court declines to permit Applicants to intervene under Fed.R.Civ.P. 24(b).[6]

Accordingly, Plaintiff's motion for preliminary injunction [# 2–2] is DENIED. Defendants' unopposed motion for partial judgment on the pleadings [# 46] is GRANTED as to Plaintiff's claims for damages. The motion to intervene [# 44] asserted by the Georgia Division of the Sons of Confederate Veterans, Don Cheeks, Ben Harbin, Robin Williams, Eddie Brown Page, III, and Michael J. Padgett is DENIED.

SO ORDERED.

___

less the applicant's interest is adequately represented by existing parties.

6.  Fed.R.Civ.P. 24(b) states in pertinent part that [u]pon timely application anyone may be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common ... In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.