**MILWAUKEE POLICE ASSOCIATION and Julie Horter, Plaintiffs–Appellants,**

v.

**Arthur JONES, Chief of Police for the City of Milwaukee, Defendant–Appellee.**

No. 98–2904.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1999.

Decided Sept. 24, 1999.

---

statement (First) of Contracts. Later Illinois cases have followed corresponding sections set forth in the Restatement (Second) of Contracts. *See, e.g., Circle Sec. Agency, Inc. v. Ross,* 107 Ill.App.3d 195, 63 Ill.Dec. 18, 437 N.E.2d 667, 672 (1982) (stating that appellee's remedies would depend on whether the breach of contract, if found, would be material or minor, citing Restatement (First) of Contracts § 275 (1932) and to Restatement (Second) of Contracts § 241 (1981), which provides guidelines for determining whether a breach is material or minor).

Jonathan Cermele (argued), Eggert & Edmonds, Milwaukee, WI, for Plaintiffs–Appellants.

Donald L. Schriefer (argued), Milwaukee City Attorney's Office, Milwaukee, WI, for Defendant–Appellee.

Before BAUER, ROVNER, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

This is one of those cases in which litigation seems to have replaced common sense. The parties appear to agree on the proper resolution, but inexplicably have not taken basic steps to reach that resolution.

In June 1998, Milwaukee Chief of Police Arthur Jones issued the following directive to officers of the Milwaukee Police Department ("Department"):

> If a Department employee makes a verbal or written complaint against another member, they are to be immediately informed that the complaint is CONFIDENTIAL and considered an internal investigation. They are to be ordered not to discuss the matter with anyone (including their Labor Union). Their reports are NOT to be duplicated, and the only statements they can make are to duly authorized Department members (IAD). Any questions can be directed to Internal Affairs. This directive is consistent with Department

policy and takes effect immediately. This matter is also to be discussed at next Tuesday's command staff meeting. Dep. Insp. REINKE clarified that in matters involving EEOC complaints, the proper governmental agency is to be contacted.

Union rights will always be respected, however, their involvement in Department investigations is limited.

(emphasis in original). Jones issued the directive to the supervisory personnel in the Department, and they communicated it to the officers. The directive was in full force and effect once uttered. After its issuance, questions arose regarding its scope. Chief Jones by that time had left town on vacation, and his subordinates issued further clarifications of the order. On June 9, Captain Lindstedt drafted a document entitled "Instructions to Members," which reiterated part of the above directive and also stated:

> Complaining members are instructed that they cannot talk to anybody regarding the matter under investigation; this includes their lawyer and/or union representative. Matters involving EEOC complaints are the exception; complaining members can seek representation in these situations....

That document was read at roll call, and became effective at that time. Finally, Deputy Chief William Gielow issued a document entitled "Instructions to Supervisors," which largely tracked Jones' earlier pronouncement, declaring:

> When a department member makes a verbal or written complaint against another member, they are to be immediately informed that the complaint is confidential and is an internal investigation. They are to be instructed not to discuss the matter with anyone. The reports are not to be duplicated and the only statements they can make are to autho-

rized departmental members such as the Internal Affairs Division. Any questions regarding the investigation are to be referred to the IAD. If the matter involves an EEOC issue (racial or sexual discrimination) the member has a right to contact the EEOC.

Gielow testified that his Instruction was in full force and effect "the moment it left his lips." Jones was on vacation when both of those Instructions were issued. For the purposes of this appeal, the original directive and the Lindstedt and Gielow instructions will be referred to generally as "the directives." [1] All apparently were binding on the officers when issued.

The Milwaukee Police Association ("MPA"), which is the union representing non-supervisory police officers of the Milwaukee Police Department, sued the Chief of Police under 42 U.S.C. § 1983 alleging *inter alia* that the directives infringed its members' rights of free speech and association. The Milwaukee County Circuit Court issued a temporary restraining order ("TRO") on June 22, 1998, prohibiting Jones and his agents from enforcing Lindstedt's and Gielow's versions of Jones' directive. That same day, Assistant Chief of Police James Koleas issued a memorandum stating, in relevant part, that based on the TRO, the two directives (Lindstedt's and Gielow's) "shall be temporarily disregarded." The memorandum further stated that "[t]hese directives shall be disregarded immediately, and until further notice."

Shortly thereafter, Jones removed the matter to the federal courts. The district court conducted a hearing on the MPA's motion for a preliminary injunction, at which Chief Jones testified. The court denied the preliminary injunction, and the MPA appealed. The day after the injunction was issued, Chief Jones issued yet

---

1. All parties agree that the Jones, Gielow and Lindstedt pronouncements were all binding on the MPA members. They are variously referred to as directives, instructions, min-utes, and memoranda. In the June 22 response to the TRO, the Department referred to them as directives, and we will do the same.

another directive on July 10, in the form of a memorandum, which provided in part:

Department members are reminded of the provisions of Rule 2/130.00 which states in part that members of the Police Department shall treat as confidential the official business of the Department. This rule normally will prohibit union or other representation for any Department member when interviewed in connection with an internal investigation or complaint that does not involve potential criminal charges against the member or an objective, reasonable probability of disciplinary action against that member.

In the paragraph that followed, Jones set forth the results of the preliminary injunction request, quoting the two paragraphs in which the district court denied that request.

## I.

■ The initial issue that we must address involves determining which of the above directives are properly before this court. Confusion over this issue permeates the briefs in this case, and resolution of the issue ordained the outcome in the district court. It is ultimately dispositive of this appeal as well.

Jones argues that his July 10 directive supplanted the earlier directives, essentially rendering the case moot as to those directives (although the City does not actually develop the mootness argument). The MPA, on the other hand, asserts that nothing in the July 10 directive directly disclaims the earlier directives, and therefore they are still in effect. The irony in this case is that the City largely does not defend the plain language of some of the earlier directives, and the MPA does not contend that the July 10 directive is unconstitutional. Therefore, the case theoretically could have been resolved by the parties at the start, had they simply met and agreed upon language that unambiguously repudiated the earlier directives and replaced them with the July 10 directive.

They have not done that, however, so we must decide whether the prior directives are properly before this court.

There is no merit to the argument that the July 10 directive supplanted the earlier directives. The July 10 directive did not even refer to those directives, and does not state what effect, if any, it has on those directives. Moreover, the July 10 directive addresses only one issue that was raised in the earlier directive, that of union representation during internal investigations. The earlier directives, however, were broader in scope than that. In addition to addressing union representation, the earlier directives also prohibited any communication to others, including an officer's own lawyer, regarding a matter under internal investigation. Therefore, we cannot agree that the belated directive of July 10 affects the viability of the earlier directives.

## II.

■ The City also asserts, however, that the earlier directives are not before the court because they were rescinded on June 22 by Assistant Chief Koleas. The "rescission" identified by the City is the memorandum issued on June 22, the day the state court granted a TRO enjoining enforcement of the Lindstedt and Gielow directives. The June 22 memorandum provided that based on the TRO, the Lindstedt and Gielow directives "shall be temporarily disregarded," "immediately and until further notice." Essentially, the City is asserting that the June 22 memorandum has rendered the challenge to those directives moot, because they are no longer in effect. In support of this argument, they point to testimony provided by Chief Jones at the hearing on the preliminary injunction, in which Jones testified that the earlier directives did not reflect his intentions, and that he would issue an order clarifying that it was not intended to preclude communication with one's attorney.

■ We cannot agree that the June 22 memorandum rendered the challenge to the Gielow and Lindstedt directives moot. The June 22 memorandum was nothing more than an effort to comply with the TRO, and was by its express terms temporary in nature. Voluntary cessation of allegedly illegal conduct does not render a case moot unless the defendant can demonstrate that " 'there is no reasonable expectation that the wrong will be repeated.' " *DiGiore v. Ryan*, 172 F.3d 454, 466 (7th Cir.1999), *quoting United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). *See also* Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, 13A Federal Practice & Procedure Juris.2d § 3533.7 (1984) ("Temporary compliance with a decree pending appeal ... clearly should not moot a case unless other circumstances show that official policies really have changed.... It is equally easy to deny mootness if officials who have changed their practices warn that former practices may be resumed at any time."). Jones has failed to demonstrate that there is no reasonable expectation that the conduct will recur. The June 22 memorandum explicitly provided that the former practice might resume in the future, declaring that the change was only temporary and "until further notice." Moreover, the June 22 memorandum was nothing more than an attempt to implement the TRO. At no time has Jones actually conceded that those directives were unconstitutional.

The Supreme Court faced an analogous situation in *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), and held that a case is not mooted by actions which are temporary in nature. In *Lyons*, the plaintiffs challenged on constitutional grounds the use of chokeholds by the Los Angeles Police Department. *Id.* at 97–98, 103 S.Ct. 1660. While the case was pending, the LAPD banned the use of one of the challenged chokeholds, and imposed a moratorium on the use of the other form of chokehold until the police board had an opportunity to review a report on alternative control techniques. *Id.* at 100, 103 S.Ct. 1660. The Court held that the case was not rendered moot because the moratorium by its terms was not permanent. *Id.* at 101, 103 S.Ct. 1660. The Court concluded that "intervening events have not 'irrevocably eradicated the effects of the alleged violation,' " and thus the case could proceed. *Id.* Here, the timing of the June 22 memorandum as well as the express language establish that the alleged rescission was not permanent in nature. There is no basis for us to conclude that the challenged behavior "could not reasonably be expected to recur," and in fact ample basis to conclude that it in fact may recur. *Moore v. Thieret*, 862 F.2d 148, 149 (7th Cir.1988). Therefore, the constitutional challenge to those directives is not mooted by either the June 22 or the July 10 statements, and we must consider whether the district court erred in refusing to grant the preliminary injunction.

## III.

■ In considering the merits of the preliminary injunction decision, the district court limited its review to the initial directive issued by Chief Jones. With respect to the subsequent directives by Gielow and Lindstedt, the court stated that they were neither reviewed nor approved by Jones. The court further credited Jones' testimony that his directive was limited to labor unions and did not apply to individuals to whom a privilege would attach, such as a priest, psychologist, health care professional, or attorney. Finally, Jones testified that he had not had an opportunity to enter an order codifying his directive and clarifying its scope, and the court found no reason to doubt that Jones was at all times acting in good faith. For those reasons, the district court addressed only the Jones directive, and did not examine whether the Gielow and Lindstedt directives should be enjoined.

748

The directives issued by Gielow and Lindstedt, however, were binding on the officers in the police department regardless of Chief Jones' intentions, and no one contests that Gielow and Lindstedt had the authority to issue them. Moreover, as we discussed above, those directives were not permanently rescinded. In fact, as of the time this case was briefed, Jones still had not issued an order permanently rescinding the prior directives. Therefore, the district court should have ruled on the Gielow and Lindstedt directives as well as the Jones directive. Jones has never conceded that the prior directives were unconstitutional, nor has he assured the MPA that the Department would not reinstate those interpretations. As we held earlier, neither the Department's actions nor Jones' apparent good faith is sufficient to render the action moot. Therefore, the district court must consider the propriety of a preliminary injunction with respect to each directive.

■■■ The resolution of that preliminary injunction request is not a foregone conclusion. Although the temporary withdrawal of the Gielow and Lindstedt directives and Jones' good faith intentions did not render the directives moot, they are relevant in determining whether injunctive relief is appropriate. Cessation of the allegedly illegal conduct, though not rendering a claim moot, nevertheless may affect the ability to obtain injunctive relief, as by impacting the ability to show substantial and irreparable injury. *W.T. Grant*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *see also Roe v. Cheyenne Mt. Conference Resort*, 124 F.3d 1221, 1229–31 (10th Cir.1997). The court retains the power to grant injunctive relief, but the moving party must still satisfy the court that injunctive relief is required. *W.T. Grant*, 345 U.S. at 633, 73 S.Ct. 894. "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.* In a situation such as this one,

in which the challenged conduct has been discontinued with a representation that at least part of the challenged conduct would be rescinded, the district court will have to determine whether injunctive relief is still appropriate, or whether only declaratory relief is available. *W.T. Grant Co.*, 345 U.S. at 632–33, 73 S.Ct. 894.

Jones' "good faith" is of less relevance in determining the likelihood of success on the merits. If the plain language of the directives unconstitutionally restricts speech, Jones' good intentions cannot vitiate that constitutional defect. Although Jones' statements are relevant in determining whether the language of the directives can be read in a constitutional manner, it cannot form the justification for entirely ignoring that language. The language of the Lindstedt directive, for instance, clearly provides that matters under investigation cannot be discussed with anyone, including the officer's lawyer. The district court may not ignore that language because Jones did not intend it to be there. It *is* there, and the directive was binding on all officers because it was promulgated by those in authority to do so. Even Jones' attorney at oral argument acknowledged potential constitutional problems with the Gielow and Lindstedt directives. In response to a question, Jones' counsel conceded that under those directives, an officer might fear discipline if she reported police corruption or other misconduct to the FBI or a state prosecutor, if that misconduct was being internally investigated. As the record illustrates, an internal investigation can take a year or more, and the public interest in that type of information is certainly significant. These are all factors that the district court must weigh in the first instance on remand. Because the court did not consider the constitutional implications of the Gielow and Lindstedt directives in its decision denying the preliminary injunction, we must remand to allow it to do so.

## IV.

■ In light of our decision to remand, we must determine the proper test that the district court should apply in analyzing the constitutional challenge. The parties are sharply divided on this issue, and in fact the MPA declared at oral argument that the purpose of its appeal was to clarify the proper standard.

In addressing the likelihood of success on the merits, the district court applied the *Pickering* test which examines whether the interest of the employee, as a citizen, in commenting upon matters of public concern is outweighed by the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The MPA argues on appeal that the *Pickering* test is inappropriate in this case because the directive bans all communication before it occurs, thus constituting a prior restraint on speech rather than a *post hoc* disciplinary decision. Accordingly, the MPA protests that the directive should be analyzed under the prior restraint line of cases and would be constitutional only if the restriction on speech is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. *Burson v. Freeman*, 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). Jones counters that the *Pickering* test is appropriate where the government is acting in its role as an employer, and that the district court therefore was correct in its analysis.

■ We note initially that the MPA is simply wrong in arguing that all prior restraints on speech are analyzed under the same test. For instance, the MPA relies on *Burson*, but that case involved a facially content-based restriction on political speech in a public forum—a context that has always demanded the highest protection. In contrast, a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legit-imate pedagogical goals. *See Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Thus, even in cases of a prior restraint on speech, the context in which the restriction occurs can affect the level of scrutiny applied. Where the government is acting as an employer, the employment context is relevant in determining the appropriate level of scrutiny in a case of prior restraint just as in a *post hoc* disciplinary situation. *See Zook v. Brown*, 865 F.2d 887, 890–91 (7th Cir.1989). The *Pickering* test, however, was crafted to balance the interests of the government as employer and the employee as citizen in the context of speech that has already occurred. In addressing such a situation of *post hoc* discipline, the government action is more closely contained to the individual or individuals involved, and a court can readily ascertain the effect of the speech on the workplace. The *Pickering* test on its face cannot be easily applied to a situation of a preemptive ban on certain speech.

■ The Supreme Court has addressed the scenario of a prior ban in an employment context, and the Court held that the general *Pickering* approach was proper with some modification to account for the differing interests involved in a case of prior restraint. In *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the Court considered the constitutionality of a law that prohibited federal employees from accepting compensation for making speeches or writing articles. In determining the proper test to apply, the Court noted that *Pickering* and its progeny involved "*post hoc* analysis of one employee's speech and its impact upon that employer's public responsibilities." *Id.* at 466–67, 115 S.Ct. 1003. In contrast, *NTEU* entailed a ban on a broad category of expression by a large number of potential speakers. *Id.* at 467, 115 S.Ct. 1003. The task for the Court in *NTEU* was to divine how to apply the components of the *Pickering* test in the context of a sweeping

750

ban on speech. The Court recognized that a prior restraint, as opposed to a *post hoc* disciplinary decision, poses problems not present in *Pickering*. With a prior restraint, the impact is more widespread than any single supervisory decision would be, and the action chills potential speech instead of merely punishing actual speech already communicated. *Id.* at 468, 115 S.Ct. 1003. Thus, the Court held that in the context of a prior restriction on expression, the government has a greater burden than it has where an isolated disciplinary action is involved. The government in such a case must demonstrate that

> the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government.

*Id., citing Pickering*, 391 U.S. at 571, 88 S.Ct. 1731. This test recognizes the government's interest when acting as an employer in the efficiency of its workplace, while also acknowledging the greater risk posed to expression by a ban on speech.

The *NTEU* test is thus the appropriate one to apply when determining the likelihood of success on the merits in this case. Similar to *NTEU*, the directives that are challenged ban speech generally and thus we are not presented with an isolated disciplinary response to speech that has already occurred. Therefore, in weighing the interests of the government as employer against that of the employees, we do not have the opportunity to consider the actual nature of the speech that was communicated and the impact it had on the workplace; instead, we are presented with a general prohibition against speech rather than an isolated communication that already occurred. The *NTEU* test provides the means for applying the *Pickering* balance to such a situation. *See, e.g., Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir.1998) (applying *NTEU* test in employee challenge to agency policy which forbid employees from speaking to the media re-

garding agency activities without first obtaining permission from the agency's media relations department); *Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1439 (D.C.Cir.1996) (*NTEU* test applicable to where a restraint on government employee's speech is accomplished through a generally applicable regulation).

Finally, we reiterate our earlier comment that this case appears overly ripe for settlement. The briefs present a picture of substantial agreement, but no joint adoption of that agreement. According to the briefs, the parties essentially agree with the first paragraph of Jones' July 10 order and both disavow and could permanently rescind the earlier directives. Where, as here, the conflict between litigants appears to be caused more by ambiguous language and fears of enforcement than by disagreement over the proper sweep of the Constitution, parties acting in good faith should be able to resolve the dispute without resorting to further legal action.

For the above reasons, the decision of the district court is VACATED and the case REMANDED for further proceedings consistent with this opinion.