Kyle ERICKSON, Plaintiff,

v.

CITY OF TOPEKA, KANSAS, Defendant.

No. 00–4150–SAC.

United States District Court, D. Kansas.

May 2, 2002.

Dennis D. Palmer, Richard M. Paul, III, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, for plaintiff.

Deanne Watts Hay, Stanley R. Parker, Randy R. Debenham, Parker & Hay, LLP, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This free speech case is before the court on the parties' cross motions for summary judgment. Plaintiff alleges that the City of Topeka has violated his civil rights under 42 U.S.C. § 1983 by enforcing an express policy that caused a constitutional deprivation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff has requested oral argument of the motions, but the court does not believe that such argument would be of material assistance in this matter.

## SUMMARY JUDGMENT STANDARD

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791(1987).

Under this standard, this court examines the record to determine whether any genuine issue of material fact is in dispute, construing the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Curtis v. Oklahoma City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1214 (10th Cir.1998).

When the nonmovant will bear the burden of proof at trial, he can survive summary judgment only by going beyond the pleadings and presenting evidence sufficient to establish the existence, as a triable issue, any essential and contested element of his case. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir.1998).

## FACTS

1. Kyle Erickson is employed by the City of Topeka as a plant operator at the City's Water Treatment Plant. He has worked for the City for approximately the past 20 years.

2. For the past several years, Erickson has been, and continues to be, a member of and actively involved in the Sons of Confederate Veterans ("SCV"). SCV is an I.R.C. § 50l(c)(3) historical, educational, benevolent, non-political, and non-sectarian organization comprised of men who can prove genealogically that one of their ancestors served honorably in the Confederate armed forces in the Civil War. Erickson qualified for membership in SCV because his great-grandfather fought in the Confederate Army during the Civil War.

3. SCV has members of many different races, including African–American men whose ancestors fought in the Civil War as Confederate soldiers. SCV distributes information commemorating the role of Hispanics and African–Americans in Confederate history.

4. It is SCV's official policy to oppose racism and it has a long tradition of publicly doing so. In standing resolutions, it publicly renounces the KKK and all others who promote hate and dishonor Confederate flags and emblems. SCV is active in promoting racial understanding and harmony and protests against groups that have attempted to use the Confederate flag as a symbol of racial hatred. It views

the flag as representing honor and chivalry in battle during the Civil War.[1]

5. For many years, Erickson has been actively involved in his spare time in a group called the "Ninth Texas Confederate Reenacters" that reenacts Civil War battles. This group travels throughout the Midwest presenting public performances of various Civil War battles.

6. Through his volunteer service in the SCV, Erickson works to obtain recognition for black Confederate soldiers, and along with several black friends and civil rights activists, hosted a ceremony on the lawn of the State Capitol Building in Topeka to honor and bring recognition to black Confederate soldiers.

7. In 1999, Erickson's son gave him a Confederate battle flag vanity license plate (hereinafter referred to as the "flag tag") as a present for his 61st birthday. Across the bottom of the flag are written, in all capital letters, the words, "HERITAGE, NOT HATE." These words express Erickson's belief that his interest in the Confederacy derives from his family's heritage and is not related to racial issues.

8. In December of 1999, Erickson placed the flag tag on the back window of the camper on his pick-up truck to show pride in his Southern heritage and to educate the public about what the Confederacy and the Confederate battle flag stand for.

9. Erickson also displayed the Missouri state battle flag and Quantrill's flag on the back window of his camper to educate the public about the meaning of these two local civil war flags.

10. Erickson drove his truck displaying these three flags to work before February of 2000.

11. The water treatment plant is located next to the Kansas River and is several miles from any other City facility. The plant is surrounded by a high concrete wall which has a gated entrance that is closed and locked at night. There is one parking lot located inside the wall and it is used by employees and others who may visit the plant.

12. While working, Erickson parks in this parking lot inside the gated wall. Erickson works from 11:00 p.m. to 7:00 a.m. on Mondays through Thursdays. On these days, Erickson is the only person routinely at the plant, and the gate to the wall is locked. On Fridays, Erickson works during the day, as do other plant employees.

13. On February 11, 2000, the City's Chief Administrative Officer, John Arnold, issued a "City of Topeka Administrative Policy" (the "Policy") subtitled "Prevention of Hostile Work Environment." The Policy states, in pertinent part: "As of February 18, 2000, no car with a racially or sexually insensitive marking will be allowed to be parked on city work sites or employee parking lots." As examples of prohibited items, the Policy lists "the Confederate flag, also referred to as the Stars and Bars, Swastikas, KKK markings and sexually explicit writings and representations."

14. Subject to the Mayor's discretion, Arnold supervises all departments of the City and provides department heads guidance about City policies, political issues, finance issues and personnel issues. Arnold's job also requires him to assist the Mayor in maintaining good order, including the responsibility and authority to issue and enforce administrative policies that apply to the entire City workforce.

---

1. The court notes that another jurisdiction has found that the Confederate battle flag is an element of the registered trademark of the SCV and has been used by the organization as its symbol for over 100 years. *Sons of Confederate Veterans, Inc. v. Glendening,* 954 F.Supp. 1099, 1100 (D.Md.1997).

15. The Policy was issued, and included the Confederate flag, because of complaints made by two African–American employees in a mediation session with the City on February 9, 2000. The City had established a task force and undertaken a diversity training program to prevent discrimination and harassment and to assist the City in complying with anti-discrimination laws.

16. None of Erickson's co-workers has complained about Erickson's flag tag.

17. After the Policy was enacted, it was posted on the message board at the treatment plant for employees to read.

18. Shortly thereafter, Erickson saw the Policy posted on the message board. At that time, he asked Ken Frasier, his immediate supervisor, why the Policy included the Confederate flag and stated his belief that the Confederate flag was not "racially insensitive." Frasier told Erickson that he would have to remove the flag tag displayed in his truck and that he could address any issues regarding the Policy to Arnold.

19. Later that day, Erickson spoke with Arnold about the Policy. Arnold told him that the Confederate flag symbolized racism and hatred and was a symbol of the KKK. Erickson replied that the Christian cross and American flag were also used by the KKK, that he did not believe that the Confederate battle flag was racially insensitive, and that the Policy was offensive to him. Arnold told Erickson to put his complaint in writing.

20. Erickson submitted a written complaint to the plant manager, Bruce Northrup, but did not receive any written response from him.

21. Thereafter, supervisors continued to tell Erickson to remove the flag tag, to cover it up, or to park outside the gated wall rather than in the parking lot of the treatment plant.

22. Erickson initially refused the City's request to remove the flag tag, believing he had a right to publicly express his views about southern heritage and what the Confederacy stands for, and not believing that the Confederate battle flag was a racially insensitive marking.

23. Erickson refused to park outside the gated wall at work for several reasons, but primarily because he feared for his safety and that of his truck if he parked outside the gated wall at night.

24. On June 19, 2000, Erickson's supervisors presented him with a written memo reciting the City's progressive discipline policy, which included, as a last resort, his being fired from employment unless he removed the flag tag from his truck or covered it while parked on the City lot or parked outside the gated wall.

25. At that time, Erickson's supervisors also told him that he would be disciplined and ultimately fired if he did not take the flag tag off his truck camper, cover it up, or park elsewhere.

26. Thereafter, Erickson removed the Confederate battle flag vanity plate from his truck, and no disciplinary steps were taken against him.

27. The City did not require Erickson to remove the Missouri state battle flag or the Quantrill flag from his truck, and Erickson continues to display them on his truck while parking in the City employee parking lot.

28. The City has declined to modify its Policy to allow Erickson to display the flag tag and has not withdrawn its threat to impose disciplinary action against him, including firing him from his job, if he places the flag tag back on his truck while parked in the City parking lot.

29. The City has never contended that Erickson intended to convey any racially

insensitive message by displaying his flag tag.

30. According to the manager of the water plant, Erickson's flag tag did not impede either Erickson's or his co-workers' ability to perform their work responsibilities.

31. Erickson did not use his truck for employment-related purposes that would ordinarily have brought it into contact with the public, and there were no City markings on the vehicle.

32. The "Confederate Flag, also referred to as the Stars and Bars" was the flag of the Confederate States of America. The Confederate battle flag was the flag carried in battle. The two flags do not look alike and were created for different purposes.[2]

33. The City, through Arnold, is aware of the public debate about the meaning of the Confederate battle flag, particularly concerning the flag dispute at the South Carolina state capitol building.

## ANALYSIS

### Kansas Bill of Rights § 11

Plaintiff asserts that defendant's policy violates the free speech guarantee of the Kansas Constitution. However, plaintiff fails to present any authority to show that Kansas' guarantees are any broader than the First Amendment's. Given that the "two constitutional provisions are generally considered coextensive." *State v. Russell*, 227 Kan. 897, 899, 610 P.2d 1122 (1980), citing *State v. Motion Picture Entitled "The Bet"*, 219 Kan. 64, 72, 547 P.2d 760 (1976), the court confines its discussion to the plaintiff's federal constitutional claims.

**2.** Nonetheless, the parties have used the two terms interchangeably in their memoranda, and the court finds the difference between the

### Inapplicable Tests/Theories

It is well established a government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Lytle v. City of Haysville*, 138 F.3d 857, 863 (10th Cir.1998) (quotation marks and citation omitted). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Z.J. Gifts D–2, L.L.C. v. City of Aurora*, 136 F.3d 683, 688 (10th Cir. 1998).

Free speech analysis is not fixed, but depends in large part upon the facts presented. The court first addresses those theories propounded by the parties which the court finds inapplicable.

Although cases which determine the rights of students or others in a public school may be analogous, they are not controlling in this case because of the distinct analysis applied therein. *See West v. Derby Unified School Dist. No. 260*, 206 F.3d 1358 (10th Cir.2000) ("First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment"); *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3d Cir.2001). Although school authorities who reasonably believe that a student's uncontrolled exercise of expression might "substantially interfere with the work of the school or impinge upon the rights of other students," *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), may forbid such expression, that test is not applied to public employers' regulation of their employees' speech.

flags immaterial for purposes of this legal analysis.

Cases determining the rights of public citizens viv-a-vis the government by use of a forum analysis are not controlling here, because they examine the government in its role as a sovereign rather than in its role as a public employer. *See e.g., Sons of Confederate Veterans, Inc. v. Glendening,* 954 F.Supp. 1099 (D.Md.1997) (holding decision to prohibit members of organization from displaying Confederate battle flag on license plate was impermissible viewpoint discrimination in violation of First Amendment free speech rights, granting summary judgment); *Sons of Confederate Veterans, Inc. v. Holcomb,* 129 F.Supp.2d 941 (W.D.Va.2001) (holding statute forbidding display of Confederate flag logo on organization's specialty license plates was unconstitutional viewpoint discrimination, not justified by any compelling state interest); *Pruitt v. Wilder,* 840 F.Supp. 414 (E.D.Va.,1994) (holding state's ban on references to deities on personalized license plates for automobiles was viewpoint-based regulation of speech in nonpublic forum, which violated motorist's free speech rights). Thus no analysis is required of the time, place and manner of defendant's restriction on plaintiff's speech. However, even where the defendant is acting in its role as an "employer," it is not relieved of its obligation to adhere to the proscriptions of the First Amendment. *Board of Educ. v. Pico,* 457 U.S. 853, 881, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring).

■ Nor will a captive audience rationale be applied. The court agrees that speech may be more readily subject to restrictions when a workplace audience is "captive" and cannot avoid the objectionable speech. *See Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1537 (M.D.Fl.1991) (finding female worker at shipyard to be a captive audience in relation to speech that comprised a hostile work environment in shop areas where she

was routinely required to be to perform her work); *Saxe,* 240 F.3d at 209–10.

■ Here, however, no facts show that defendant's employees are necessarily, repeatedly, extensively or even clearly exposed to plaintiff's speech such that a captive audience rationale should apply. Although evidence establishes that the parking lot is visible from defendant's conference room and that persons walk through the parking lot to reach their workstations, no evidence establishes that on Fridays, (the only days plaintiff works a day shift), plaintiff's flag tag is visible from the conference room, that plaintiff's truck is positioned such that the flag tag can routinely be seen by those in the conference room, or that the amount of time spent by plaintiff's employees either in the conference room or while walking through the parking lot renders them a captive audience to plaintiff's speech.

■ The court additionally rejects defendant's invitation to construe plaintiff's display of the flag tag as conduct rather than speech. Flags and other symbols are entitled to First Amendment protection as variants of speech. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 404–06, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Wooley v. Maynard,* 430 U.S. 705, 715, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (state violates First Amendment by requiring a citizen to display "Live Free or Die" on his license plate); *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). Thus even if plaintiff's flag tag were nothing other than a symbol of the confederate flag, it would be entitled to protection.

But plaintiff's flag tag was not merely a visual depiction of a confederate flag, as it was always displayed with the words "HERITAGE NOT HATE" superimposed thereon. That written words were an integral part of this particular flag tag curtails any analysis the court may otherwise have

made to determine whether plaintiff's display was or was not speech. Plaintiff's flag tag, viewed in its entirety, was "core" First Amendment speech, not merely symbolic speech mixing elements of speech and conduct, or falling only within the outer ambit of free speech protection.

**Applicable Test**

■ The court has carefully considered the host of theories propounded by the parties, but finds no basis for application of anything but the four-part test, known as the *Pickering/Connick* test, to determine whether a public employer has infringed its employee's freedom of expression. *See Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Lighton v. University of Utah,* 209 F.3d 1213,1224 (10th Cir.2000).

**A. Protected Speech**

The Tenth Circuit recently reviewed the framework for determining whether speech is protected under law, in stating:

> *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny set forth the applicable framework for determining the First Amendment rights of public employees ... *See Moore v. City of Wynnewood,* 57 F.3d 924, 931 (10th Cir. 1995). Under this framework, we must first decide whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). We determine this "by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708. If the speech addressed a matter of public concern, we must next balance the employee's "interest in making [his] statement against

'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through it employees.' " *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731). These two steps in the inquiry present legal issues to be resolved by the court. *See Gardetto v. Mason,* 100 F.3d 803, 811 (10th Cir.1996).

*Prager v. LaFaver,* 180 F.3d 1185, 1190 (10th Cir.1999). *See Lighton,* 209 F.3d at 1224 (if the balance tips in the employee's favor, he must prove the speech was substantial or a motivating factor in the detrimental employment decision, then the employer has an opportunity to prove the same decision would have been reached, even absent the protected conduct.)

The court thus addresses whether plaintiff's speech touches upon matters of public concern. The Tenth Circuit has defined matters of public concern as "those of interest to the community, whether for social, political, or other reasons." *Lytle,* 138 F.3d at 863.

Plaintiff's speech in the present case is distinctively different from speech examined by the Tenth Circuit in other public employee free speech cases. Plaintiff's speech was not calculated to disclose misconduct of any kind, and thus was not protected as whistleblower's speech. *See Starrett v. Wadley,* 876 F.2d 808 (10th Cir.1989); *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988). Nor was plaintiff's speech related to any internal employee dispute, which would preclude it from being viewed as addressing matters of public concern. *See David v. City and County of Denver,* 101 F.3d 1344, 1355 (10th Cir.1996); *Hom v. Squire,* 81 F.3d 969 (10th Cir.1996). *See also Connick,* 461 U.S. at 148, 103 S.Ct. 1684.

The court is to "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. (citation omitted)." *Woodward v. Worland,* 977 F.2d 1392, 1403 (10th Cir.1992). Plaintiff's speech would appear to meet this "broader public purpose" test. However, to be protected, speech must do more than just generally relate to a matter of public interest; it must also be sufficiently informative to be useful to the public in evaluating government conduct. *See Moore v. City of Wynnewood,* 57 F.3d 924, 932 (10th Cir. 1995); *Wilson v. City of Littleton,* 732 F.2d 765, 768 (10th Cir.1984). Thus, "[i]n order for a public employee's speech to be of public concern, ... it is not always enough that its subject matter could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest. What is actually said on that topic must itself be of public concern." *Koch v. City of Hutchinson,* 847 F.2d 1436, 1445 (10th Cir.1988) (en banc) (quotation and citations omitted).

Here, because the words expressed on the flag tag were "HERITAGE NOT HATE," the court has no hesitancy in finding that what was actually said on the topic was itself of public concern. *See generally Dunn v. Carroll,* 40 F.3d 287, 292 (8th Cir.1994) (finding fireman's speech in wearing American flag patch on uniform during military buildup in Persian Gulf "obviously" on a matter of public concern.); *Dishnow v. School Dist. of Rib Lake,* 77 F.3d 194, 197 (7th Cir.1996) (finding "public concern" to mean matters in which the public might be interested, as distinct from wholly personal grievances.) · Contrary to defendant's assertions, plaintiff is not required to show that the meaning of the flag tag or the words expressed thereon were a subject of raging debate in this locale before his speech may be found to be of public concern. The City, through Arnold, admitted its awareness of the public debate about the meaning of the Confederate battle flag, but even had it not done so, the court would find that plaintiff's speech was on a matter of public concern. Plaintiff's speech did not pertain to workplace conditions, and the court cannot reasonably find that plaintiff's speech "dealt with only personal disputes and grievances with no relevance to·the public interests." *Conaway* 853 F.2d at 796.

"In deciding whether a particular statement involves a matter of public concern, the fundamental inquiry is whether the plaintiff speaks as an employee or as a citizen." *David,* 101 F.3d at 1355, citing *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. Here, plaintiff's display of his flag tag was purely as a citizen and not as an employee. When plaintiff placed the flag tag in his vehicle, he was participating in a public dialogue on matters of interest to the public, and no more was required to place his speech, prima facie, within the protection of the First Amendment.

Defendant asserts that plaintiff's display of the flag tag is not protected speech because it is discriminatory conduct in the form of a hostile work environment. *See Robinson,* 760 F.Supp. at 1535; *Baty v. Willamette Indus. Inc.,* 172 F.3d 1232, 1246–47 (10th Cir.1999) (rejecting assertion that hostile work environment judgment against employer based exclusively on offensive workplace speech violates First Amendment); *Wisconsin v. Mitchell,* 508 U.S. 476, 487, 113 S.Ct. 2194, 124 L.Ed.2d 436(1993) (noting Title VII as an example of a permissible regulation of conduct); *R.A.V. v. St. Paul,* 505 U.S. 377, 389–390, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)(finding that where the government does not target conduct on the basis of its expressive content, acts are not shielded

from regulation merely because they express a discriminatory idea or philosophy).

Here, however, the policy at issue explicitly regulates "racially ... insensitive marking[s]." It is not the mere act of making a mark which is prohibited, but rather the racially insensitive content of the mark, i.e., the speech, which is targeted by defendant's policy. Thus it is not plaintiff's behavior, conduct or acts which the policy seeks to control, but plaintiff's message which it purports to silence. The court therefore finds that plaintiff's flag tag is speech protected by law.

## B. Balancing of Interests

The court next addresses whether defendant's interest in preventing plaintiff's speech outweighs plaintiff's interest in speaking.

### NTEU balancing test

 The parties disagree sharply as to which balancing test the court should apply in analyzing this aspect of the constitutional challenge. Defendant alleges that the traditional *Pickering* test applies, while plaintiff urges the court to apply a modified balancing test. This modified test imposes a heightened burden on the government when it imposes a prior restraint on speech of numerous employees, as in *United States v. National Treasury Employees Union (NTEU )*, 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("*NTEU*"), rather than merely reacts to the speech of one employee, as in *Pickering*. If traditional *Pickering* applies, the government need only prove that its interest, as an employer, in promoting the efficiency of the public services it performs through it employees, outweighs plaintiff's interest in speaking. If, however, *NTEU* applies, the government must show that its restriction on speech is necessary to prevent actual disruption of its operations as an employer.

In *NTEU*, the Supreme Court examined a factual situation in which an honoraria ban prohibited numerous federal employees from accepting compensation for making speeches or writing articles unrelated to their employment and on their free time.

The court required the government to show "that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." 513 U.S. at 468, 115 S.Ct. 1003.

The Court explained that the facts in *NTEU* differed from those at issue in *Pickering* and its progeny, in stating: "[T]his case does not involve a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities," but rather the constitutionality of an *ex ante* rule, which is a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *NTEU*, 513 U.S. at 466–67, 115 S.Ct. at 1013. The Government bore a heavier burden in *NTEU* to justify the restriction on speech because "the widespread impact of the honoraria ban ... gives rise to far more serious concerns than could any single supervisory decision," *id*, and because "unlike an adverse action taken in response to actual speech, this [honoraria] ban chills potential speech before it happens." *Id.*

Because of those factors, the Court required the government to clearly show that the ban was necessary to prevent actual disruption of the Government, and found the Government's general assertion of administrative concerns insufficient to justify the ban. *See Id.* at 474–75, 115 S.Ct. at 1017 (stating that "a blanket burden on the speech of nearly 1.7 million federal employees requires a much strong-

er justification than the Government's dubious claim of administrative convenience.")

The Tenth Circuit has addressed *NTEU* in only one case, in stating:

When the government is acting as an employer, rather than as a sovereign, the First Amendment does not apply with full force. Although the government, acting as an employer, "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983), a government employer "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. National Treasury Employees Union (NTEU)*, 513 U.S. 454, 465, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995). To determine whether a public employer has infringed the employee's freedom of expression, we apply a four-part test, known as the *Pickering/Connick* test. *See Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Lytle*, 138 F.3d at 863; see also *NTEU*, 513 U.S. at 467, 115 S.Ct. at 1013 (stating that "the Government must be able to satisfy a balancing test of the *Pickering* form to maintain a statutory restriction on employee speech").

*Horstkoetter v. Department of Public Safety*, 159 F.3d 1265, 1271 (10th Cir.1998).

In *Horstkoetter*, the Tenth Circuit applied the traditional *Pickering* balancing test rather than the stricter *NTEU* balancing test, found that the interests of the government employer in prohibiting political yard signs outweighed the patrolmen's interest in displaying them, and upheld the highway patrol policy prohibiting troopers from displaying political yard signs as fa-

cially constitutional under First Amendment. No showing of actual disruption or harm to the operation of the highway patrol was required.

The Tenth Circuit rejected plaintiffs' argument in *Horstkoetter* that, in order for the balancing test to weigh in the government's favor, the record had to show that removal of the particular political signs furthered the interests behind the policy. The Tenth Circuit explained that this was because the regulation of the political nature of the employees' speech was designed to protect the employees' job security, in stating:

... in [*NTEU*] the Court did require some evidence of disruption, but only because the regulation at issue there, a ban on honoraria, was, unlike the Hatch Act and other similar regulations on political speech, aimed at restricting employees' rights rather than protecting their job security. We are persuaded that in cases involving a constitutional challenge to a regulation on public employees' political speech, the government need not make a particularized showing where at least one of the interests served by the regulation is the protection of public employees' job security.

159 F.3d at 1274 n. 4.

In this case, defendant does not allege that the protection of public employees' job security is among the interests served by its policy, thus application of *NTEU's* balancing test is not precluded by *Horstkoetter*.

Other circuits which have addressed governmental employers' prior restraints on public employees' speech, post-*NTEU*, have modified the balance, requiring the government to meet the stricter standard. *See e.g., Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458 (2d Cir.1999) (applying stricter *NTEU* standard where department's parade policy re-

strained speech before it had occurred; finding police department failed to demonstrate that plaintiffs' interests and the interests of plaintiffs' potential audiences were outweighed by the expression's "necessary impact on the actual operation of the government."); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742 (7th Cir.1999) (finding *NTEU* prior restraint balancing test applicable where presented with a general prohibition against speech rather than an isolated communication that already occurred); *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir.1998) (applying *NTEU* test in employee challenge to agency policy which forbade employees from speaking to the media regarding agency activities without first obtaining permission from the agency's media relations department); *Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1439 (D.C.Cir.1996) (applying *NTEU* test where a restraint on government employee's speech was accomplished through a generally applicable regulation); *Tucker v. State of Cal. Dept. of Educ.*, 97 F.3d 1204, 1211 (9th Cir.1996) (finding First Amendment violated by orders banning religious advocacy by employees where the government's asserted interests did not show the "necessary impact on the actual operation" of the Government.) *See also Urofsky v. Gilmore*, 216 F.3d 401, 431 (4th Cir.2000) (J. Wilkinson, concurring) (stating government should be required to show that the interests of plaintiffs and of society in the expression "are outweighed by [the] expression's necessary impact on the actual operation of the Government.")

The Seventh Circuit explained why the *Pickering* balance is insufficient to address prior restraints on speech by governmental employers:

The *Pickering* test, however, was crafted to balance the interests of the government as employer and the employee as citizen in the context of speech that has already occurred. In addressing such a situation of post hoc discipline, the government action is more closely contained to the individual or individuals involved, and a court can readily ascertain the effect of the speech on the workplace. The *Pickering* test on its face cannot be easily applied to a situation of a preemptive ban on certain speech.

*Milwaukee Police Ass'n*, 192 F.3d at 749.

The court believes that the stricter *NTEU* standard should be applied here, and shall thus require the government to show that plaintiff's interest in speaking[3] is outweighed by his expression's necessary impact on the actual operation of the City. *See generally Gardetto v. Mason*, 100 F.3d 803, 815–16 (10th Cir.1996) (stating that "the government ... cannot rely on purely speculative allegations that certain statements caused or will cause disruption to justify the regulation of employee speech").

**Application of NTEU**

■ This is a burden defendant cannot meet, given the undisputed fact that the water plant manager testified that Erickson's flag tag did not impede either Erickson's or his co-workers' ability to perform their work responsibilities. No contrary evidence was offered. "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' ... It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation

**3.** The court need not address whether the interests of plaintiff's potential audience are

also to be weighed in the balance.

will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475, 115 S.Ct. 1003, quoting *Turner Broadcasting Sys. Inc. v. F.C.C.*, 512 U.S. 622, 624, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

### Pickering balancing test

But even had the court applied the traditional *Pickering* balancing of interests rather than *NTEU's* stricter test, the same result would be reached.

The City asserts that it required plaintiff to remove the flag tag in order to comply with its newly adopted harassment policy. Defendant articulates its interests as: 1) furthering its compelling interest in preventing or correcting racial discrimination, including a hostile work environment; 2) avoiding the expenditure of taxpayer dollars for liability in Title VII lawsuits; 3) preventing the "visceral feelings" persons may experience when viewing the flag tag; and 4) preventing non-work issues from distracting its work force. These interests are addressed below.

**Avoiding emotive impact** The city's interest in avoiding the emotive impact to some viewers of the flag tag is stated to be a "practical" one. Defendant speculates that the negative feelings some persons experience upon viewing the flag tag distract them from their work, raising the discomfort level and lowering productivity, engendering resentment toward co-workers, and arousing sentiment that defendant does not care about discrimination.

Although this argument is unsupported by citation to authority or to any facts, defendant appears to be contending that its anti-harassment policy is a permissible restriction on speech because a concrete harm to its employees is a negative "secondary effect" of the unrestricted speech. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (upholding ordinance "narrowly tailored" to prohibit adult motion picture theaters from operating in certain locations based upon the negative secondary effects created by such theaters); *Essence Inc. v. The City of Eagle Heights*, —— F.3d —— (10th Cir. April 8, 2002) (applying secondary effects doctrine in finding regulation unconstitutional).

■■■ But even if defendant tacitly relies upon this "secondary effects" rationale, it has no application here. "The Supreme Court has made it clear that the government may not prohibit speech under a 'secondary effects' rationale based solely on the emotive impact that its offensive content may have on a listener." *Saxe*, 240 F.3d at 209. "Listeners' reactions to speech" are not the kind of "secondary effects" discussed in *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

■■■ Further, the government's interest in stemming listeners' reactions to speech has been soundly rejected in other cases specifically examining the emotive impact of the confederate flag.

Even though the Commonwealth's ban of the Sons' logo may, indeed, prevent some motorists from becoming upset or enraged, this means for squelching unrest runs afoul of Justice Douglas' words in *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949):

"[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance...." *Id.* at 4, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131. Just as the

Supreme Court has found that an "apprehension of disturbance ... is not enough to overcome the right to freedom of expression," *Tinker,* 393 U.S. at 508, 89 S.Ct. 733, neither is a fear of causing controversy.

*SCV,* 129 F.Supp.2d at 946.

[18] However well-intentioned or politically astute the MVA's revocation decision might have been in the wake of such controversy, " '[p]ublic intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms.' " (citations omitted.) A desire to stem listeners' reactions to speech is simply not a viewpoint-neutral basis for regulation. *Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 134, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992); *see Cornelius,* 473 U.S. at 812, 105 S.Ct. at 3454 ("the purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers").

*SCV,* 954 F.Supp. at 1104 (addressing eruption of a "public firestorm" over the appearance of a Confederate battle flag on Maryland plates, which motivated the state to prohibit them).

■■■ The First Amendment does not countenance such viewpoint discrimination, even for the purpose of suppressing speech that may be perceived as racially degrading or hostile. *Iota XI Chapter of Sigma Chi Fraternity v. George Mason University,* 773 F.Supp. 792, 795 (E.D.Va.1991), *aff'd,* 993 F.2d 386 (4th Cir.1993) (The First Amendment "does not recognize exceptions for bigotry, racism, and religious intolerance or ideas or matters some may deem trivial, vulgar or profane.") *SCV,* 954 F.Supp. at 1104.

The Supreme Court has repeatedly held that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it. *See e.g., Tinker,* 393 U.S. at 509, 89 S.Ct. 733 (1969) (school may not prohibit speech based on the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."); *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) ("It is firmly settled that ... the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.") The city's interest in avoiding the emotive impact to some viewers of the flag tag is thus entitled to no weight.

**Preventing racial harassment**

■■■ The court next examines defendant's interest in preventing racial harassment in the workplace.[4] Plaintiff has not challenged defendant's assertion that a governmental employer's prevention of a racially hostile work environment is a significant or compelling governmental interest. *See Saxe,* 240 F.3d at 209–10; *Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987) (regarding sex discrimination); *Robinson,* 760 F.Supp. at 1536.

The parties have not shown the court cases which squarely address a public employer's "hostile environment" defense to an employee's First Amendment claim, although that rationale has been found insufficient in public accommodation cases. *See*

---

4. The court finds no difference in kind, for purposes of this discussion, between defendant's interest in not suffering the financial impact of losing an employment discrimination lawsuit and its interest in preventing the acts that would give rise to such liability.

*generally Henderson v. City of Murfrees-boro, Tenn.*, 960 F.Supp. 1292 (M.D.Tenn. 1997) (rejecting City's assertion that its removal of a painting was to comply with its sexual harassment policy and to further the compelling state interest of eradicating sexual discrimination and avoiding Title VII lawsuits); *Coleman v. Miller*, 885 F.Supp. 1561 (N.D.Ga.1995), *aff'd*, 117 F.3d 527 (11th Cir.1997) (holding state flag which contained symbol used in Confederate battle flag does not violate Title II of Civil Rights Act of 1964 prohibiting discrimination in places of public accommodation.)

Defendant contends that it cannot address prevention of hostile work environment concerns anywhere but at the workplace, but plaintiff can speak his mind about the flag tag elsewhere. This assertion, although relevant to a time, place and manner analysis, fails to demonstrate how the policy at issue serves defendant's interest in preventing hostile work environment claims.

Defendant appears to believe that there is some categorical "harassment exception" from First Amendment protection for speech that is within the ambit of federal anti-discrimination laws. This is not the case. *See Saxe*, 240 F.3d at 211 ("courts have never embraced a categorical 'harassment exception' from First Amendment protection for speech that is within the ambit of federal anti-discrimination laws.").

 Nor has defendant shown that plaintiff's speech falls within the ambit of Title VII. In prohibiting "racially insensitive" markings, defendant's policy goes well beyond the conduct proscribed by Title VII. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("Conduct that

is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("Title VII is not violated by the "mere utterance of an ... epithet which engenders offensive feelings in an employee" or by mere " 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment.") Here, defendant's policy prohibits substantially more conduct than would give rise to liability under Title VII, rendering this justification unavailing.

Additionally, the breadth of defendant's policy makes it difficult to determine which expressions are encompassed within it.

It is well established that restrictions on protected expression which award unbridled discretion to municipal officials are impermissible as they "result [ ] in virtually unreviewable prior restraints on First Amendment rights." (citations omitted)

*Henderson v. City of Murfreesboro, Tenn.*, 960 F.Supp. 1292 (M.D.Tenn., 1997).

Nonetheless, defendant's policy is specific in listing, as an example of a racially insensitive marking, "the Confederate flag, also referred to as the Stars and Bars." Defendant has shown that two African American employees[5] complained on February 9, 2000, that some employee other than plaintiff drove his car into the employee parking area with some display of a Confederate Flag, and stated that this display was offensive to African American employees. One of the two added that if the City permitted the display to continue,

---

**5.** The record does not clarify whether these employees worked at the water plant or else-

where in the city.

he would consider the work environment to be racially hostile.

No allegation is made, however, that anyone complained about plaintiff's flag tag. This leads the court to believe that those who complained about other confederate flag displays either did not see plaintiff's flag tag, or that it was not offensive to them, perhaps because of its viewpoint expressing "Heritage not Hate." But even had the employees seen plaintiff's flag tag and complained about it, this would not show that a reasonable person would be offended by the flag tag or that this single instance, even if viewed as racially offensive, would constitute a racially hostile work environment. *See Harrison v. Eddy Potash, Inc.,* 248 F.3d 1014, 1023 (10th Cir.2001) (whether conduct is sufficiently severe or pervasive as to alter the conditions of employment and create an abusive working environment must be judged by both an objective and a subjective standard); *Braden v. Cargill, Inc.,* 176 F.Supp.2d 1103, 1112 (D.Kan.2001) (isolated incidents of harassment do not constitute pervasive conduct), citing cases.

██ Defendant's policy reflects viewpoint discrimination[6] in regulating speech based upon the City's disagreement with the particular position plaintiff wishes to express. Defendant has prohibited display of the confederate flag because some find it offensive as racially hostile or degrading speech, although others find it a way to honor their heritage.

The meaning of the symbol depends upon one's perspective. To some, it represents the undeniable fact that Georgia was a member of the Confederacy and did secede from the Union. The flag may also represent southern heritage, the old South, or values of independence. Undeniably, to others it represents white supremacy, rebellion, segregation, and discrimination. The court is not prepared to say that any of these perspectives are (sic) incorrect.

*Coleman,* 885 F.Supp. at 1569.

Under the defendants' guidelines, the use of the Confederate battle flag logo to convey that the flag is a symbol of honor is prohibited because it is a view that some find offensive as racially hostile or degrading speech. This approach advances the viewpoint of those offended by the flag and discourages the viewpoint of those proud of it. *See SCV,* 954 F.Supp. at 1103–04 ("when the MVA Administrator, in response to 'numerous complaints,' halted the issuance of SCV–MD organization plates bearing the Confederate battle flag logo and ordered the recall of all previously issued such plates, it is plain beyond dispute that he advanced the viewpoint of those offended by the flag and discouraged the viewpoint of those proud of it.")

Although the defendant has a legitimate interest in the way public monies are spent and in its compliance with state and federal laws, *see Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662(1998) (requiring, as part of employer's affirmative defense, that the employer exercise reasonable care to prevent and correct promptly any sexually harassing behavior), defendant's interest in avoiding liability for employee's race discrimination claims is entitled to no greater weight than its interest in avoiding liability for employee's free speech claims, *see Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 628, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) ("there is no such distinction between, or hierarchy among, constitutional rights").

---

**6.** Although the court does not engage in a forum analysis, some comment on the content-based nature of defendant's policy is appropriate.

### Increasing Efficiency/ Productivity

 This leaves solely defendant's interest in preventing non-work issues from distracting its work force, and its interest in efficiency in general. To the extent this interest relates to defendant's desire to make its workers comfortable by preventing them from viewing controversial images, it is indistinguishable from defendant's interest in preventing an emotive impact, discussed above.

To the extent this interest seeks generally to increase productivity of the workforce by not distracting them from non-work issues, the focus is "on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. From this perspective, however, defendant fails to demonstrate an interest that outweighs plaintiff's First Amendment rights. Although plaintiff's statement was made in a workplace parking lot, there is no evidence that it interfered with the efficient functioning of the office. Defendant has made no attempt to show that its workforce would be any more productive or efficient in the absence of plaintiff's flag tag, nor can such an inference be made given the evidence that no one complained about plaintiff's flag tag, and that the plant manager testified that the presence of the flag tag did not impede anyone's ability to do their jobs at the water plant.

The court thus finds that plaintiff's interest in speaking outweighs defendant's articulated interests in banning plaintiff's speech. Therefore, plaintiff is entitled to summary judgment on his free speech claim.[7] Because the defendant's policy is unconstitutional, it shall not be enforced, and plaintiff shall neither be prevented from displaying his flag tag in the manner which gave rise to this lawsuit nor disciplined for so doing.

Plaintiff may file its motion for attorneys' fees pursuant to 42 U.S.C. § 1988, and its memorandum in support thereof, complete with copies of time sheets, billing rates, affidavits and/or other supporting documentation, no later than May 31, 2002, and defendant shall be given 10 business days after its receipt of plaintiff's motion in which to file a response. The court shall determine thereafter whether a hearing on the issue of attorneys' fees is necessary.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment (Dk.50) is granted and that defendant's motion for summary judgment (Dk.49) is denied.

IT IS FURTHER ORDERED that plaintiff's motion for oral argument of the cross-motions for summary judgment (Dk.58) is denied.

---

7. The parties do not address the remaining issues in the traditional *Pickering* analysis, and given the fact that this case involves a prohibition on speech, rather than discipline imposed in reaction to speech, the court finds it unnecessary to do so. In the alternative, the court finds that plaintiff's flag tag was a substantial or a motivating factor in the employment decision requiring plaintiff to remove or cover the flag tag while in the employee parking lot, under threat of discipline and eventual termination for refusing to so do, and that the same threat would not have been made, absent plaintiff's protected conduct.